UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUNE NEWIRTH, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>AEGIS SENIOR COMMUNITIES LLC,<br><br>    Defendant. | Case No. 16-cv-03991-JSW<br><br>**ORDER DENYING DEFENDANT'S MOTION TO DISMISS AND SETTING INITIAL CASE MANAGEMENT CONFERENCE**<br><br>Re: Dkt. No. 25 |

Now before the Court for consideration is the motion to dismiss filed by Aegis Senior Communities, LLC ("Aegis"). The Court has considered the parties' papers, relevant legal authority, and the record in this case, and the Court finds the motion suitable for disposition without oral argument. *See* N.D. Civ. L.R. 7-1(b). For the reasons set forth below, the Court HEREBY DENIES Aegis's motion to dismiss.[1]

**BACKGROUND**

Aegis provides assisted living and memory care for senior citizens and persons with disabilities. (Dkt. No. 23, Second Amended Class Action Complaint ("SAC") ¶ 23.) Assisted living facilities such as those run by Aegis provide room, board, and daily assistance for seniors in various activities of daily living, such as preparing meals, shopping, transportation, paying bills, and others. (*Id.* ¶ 24.)

In Aegis facilities, residents are charged a base rate, which includes room board, basic maintenance, cleaning, and laundry. (*Id.* ¶ 27.) In addition to this base rate, a resident will be charged a daily rate based on any additional services a resident might need. Plaintiffs provide the

---

[1] Aegis's request for judicial notice (Dkt. No. 42) is GRANTED.

following description of the resident assessment system used to calculate the applicable daily rate in the SAC:

> Aegis assesses each resident before admission and then again at quarterly intervals and/or whenever there is a change of the resident's condition.  By performing these assessments, Aegis determines what additional services a resident needs, such as assistance with [activities of daily living].  Each additional need correlates to a number of points, which depend on how much more time Aegis staff must spend caring for the resident and what type of staff should perform the services.  The total number of points is multiplied by a dollar amount resulting in a per-day care fee charge.  Thus, the higher the points assessed, the more money Defendant charges the resident.

(*Id.* ¶ 27.)  This resident assessment system is at the center of this action.

Plaintiffs allege that Aegis affirmatively represents that the resident assessment system will be used to "determine and then provide the amount of caregiver time Aegis has itself decided is necessary to provide the services and care for which its residents are paying." (*Id.* ¶ 28.)  For example, in the Aegis Living Residence and Care Agreement ("Residence Agreement"), Aegis states to incoming residents that it

> will provide YOU with personal assistance and care on an as needed basis. . . .  When You applied for admission to the Community, the professional staff of Aegis performed a comprehensive assessment of your needs . . . Aegis will perform reassessments in light of your changing needs to determine the services that You may require.  You will receive services appropriate to your individual need.

(*Id.* ¶ 29.)  Similarly, in a binder that Aegis provides to prospective and incoming residents, Aegis includes a section entitled "Assessing Resident Care Needs" which provides, in part:

> We believe that residents should only be charged for the services they need and receive.  That is why we use a point system rather than care levels.  The number of "care points" that is assigned to a particular service is based on the average amount of staff time required to provide that service, the frequency, and the cost of the staff person that will be performing the task.

(*Id.* ¶ 32.)  Further, in the Resident Service Plan that is prepared for each resident, Aegis indicates the services a resident requires, the way in which staff will provide those services, and the number of "care points" that Aegis assesses for staff providing that service.  (*Id.* ¶ 31.)  For example, the Plan may indicate that a resident needs assistance with "Grooming" by stating that "Resident

1  requires reminders to perform grooming tasks (shave, comb hair, nail care, brush teeth, wash hair,
2  etc.)." To meet this need, the Plan will indicate as an "Action" that "Staff will remind resident to
3  groom and monitor grooming needs" and then assess nine points for the staff providing this
4  service. (*Id.*)

5  Plaintiffs maintain that potential and current residents in Aegis facilities reasonably
6  understand these representations to be the "policies and procedures followed by Aegis both for
7  determining the needs of facility residents and for setting staffing levels at each of its California
8  facilities." (*Id.* ¶ 35.) Stated another way, Plaintiffs contend that the representations cause
9  prospective and current residents to reasonably expect that Aegis "uses a system that ensures
10 adequate staffing to meet all current needs based on their comprehensive needs assessments and
11 the number and type of staff hours Aegis has itself determined are necessary to satisfy those
12 needs." (*Id.* ¶ 36.)

13 Contrary to Aegis's representations and resident expectations, Aegis does not, in fact, use
14 the assessment system or care points in determining facility staffing. (*Id.* ¶ 38.) Rather, each
15 facility is given a pre-determined budget (including a budget for staffing) that is driven by profit
16 objectives rather than the care and staffing needs of facility residents. (*Id.* ¶ 39.) While general
17 managers or executive directors may seek a budget or staffing increase, in practice they are
18 discouraged from doing so by Aegis's bonus policy. (*Id.* ¶ 40-42.) Aegis's budgetary practices
19 result in the facilities being forced to use a fixed staffing schedule that does not take into account
20 fluctuating resident needs based on re-assessments, changes in resident condition, or occupancy
21 changes. (*Id.* ¶ 46.) Because Aegis does not use its resident assessment system or care points in
22 determining a facility's staffing level, resulting staffing levels are "substantially lower than those
23 Aegis itself has determined are necessary to meet the assessed needs of residents." (*Id.* ¶ 47.)
24 This, in turn, creates the risk that the Aegis residents will not have their care needs met or will
25 otherwise suffer an injury (such as malnutrition, falls, and the like) due to the lack of adequate
26 care and attention from staff. (*Id.* ¶ 47.)

1     Plaintiffs are current or former residents of an Aegis facility.[2] In general, Plaintiffs allege
2 that Aegis made the above representations about the resident assessment system to them (or their
3 representative). As a result, Plaintiffs allege that they understood that as their care needs
4 increased, Aegis staff would spend additional time assisting them. (*See, e.g.*, *id.* ¶¶ 62, 76, 82.)
5 Ultimately, however, Plaintiffs contend that while their care points — and thus the amount Aegis
6 charged them — increased, there was no corresponding adjustment to the staff time spent
7 assisting them or their facility's staffing level. This resulted in Plaintiffs paying for services they
8 did not receive. (*See, e.g.*, *id.* ¶¶ 64, 67, 77-78, 83-84.)

9     Based on these allegations, Plaintiff alleges three causes of action: (1) Violation of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq.*; (2) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*; and (3) elder financial abuse, in violation of California Welfare & Institutions Code § 15610.30.

## ANALYSIS

**A.    Applicable Legal Standards**

A motion to dismiss is proper under Federal Rule of Civil Procedure 12(b)(6) where the pleadings fail to state a claim upon which relief can be granted. The Court's "inquiry is limited to the allegations in the complaint, which are accepted as true and construed in the light most favorable to the plaintiff." *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008). Even under the liberal pleading standard of Federal Rule of Civil Procedure 8(a)(2), "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Pursuant to *Twombly*, a plaintiff must not merely allege conduct that is conceivable but must instead allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

---

[2] Plaintiffs Elizabeth Barber, Andrew Bardin, and Thomas Bardin are suing as successors-in-interest to the Estate of Margaret Pierce, a former Aegis resident who died in 2016. (SAC ¶ 80.)

4

1  draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v.*
2  *Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).
3        Claims sounding in fraud or mistake are subject to heightened pleading requirements,
4  which require that a plaintiff claiming fraud "must state with particularity the circumstances
5  regarding fraud or mistake." Fed. R. Civ. P. 9(b). In addition, a claim "grounded in fraud" may
6  be subject to Rule 9(b)'s heightened pleading requirements. A claim is "grounded in fraud" if the
7  plaintiff alleges a unified course of fraudulent conduct and relies entirely on that course of conduct
8  as the basis of his or her claim." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1104 (9th Cir.
9  2003). Rule 9(b)'s particularity requirements must be read in harmony with Federal Rule of Civil
10 Procedure 8, which requires a "short and plain" statement of the claim. The particularity
11 requirement is satisfied if the complaint "identifies the circumstances constituting fraud so that a
12 defendant can prepare an adequate answer from the allegations." *Moore v. Kayport Package Exp.,*
13 *Inc.*, 885 F.2d 531, 540 (9th Cir. 1989). Accordingly, "[a]verments of fraud must be accompanied
14 by 'the who, what, when, where, and how' of the misconduct charged." *Vess*, 317 F.3d at 1107
15 (quoting *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997)).

16 **B.  Plaintiffs Have Adequately Alleged Violations of the CLRA and UCL.**

17       The CLRA generally prohibits "unfair methods of competition and unfair or deceptive acts
18 or practices." Cal. Civ. Code § 1770(a). Similarly, the UCL prohibits any "unlawful, unfair or
19 fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. For both the CLRA and
20 fraudulent prong of the UCL, California courts have adopted the "reasonable consumer" standard
21 to determine whether conduct is deceptive or misleading. *See Williams v. Gerber Prods. Co.*, 552
22 F.3d 934, 938 (9th Cir. 2008). Because the standard is the same, these statutes often are analyzed
23 together. *See, e.g.*, *MacDonald v. Ford Motor Co.*, 37 F. Supp. 3d 1087, 1097-98 (N.D. Cal.
24 2014) ("Generally, the standard for deceptive practices under the fraudulent prong of the UCL
25 applies equally to claims for misrepresentation under the CLRA, and courts often analyze the two
26 statutes together.").

27       Under the "reasonable consumer" standard, a plaintiff must show that members of the
28 public are likely to be deceived by the challenged business practice. *See, e.g.*, *Swearingen v. Late*

*July Snacks LLC*, No. 13-cv-04324-EMC, 2017 WL 1806483, at *4 (May 5, 2017).  "Likely to deceive" means more than a "mere possibility" that some consumers were misled.  Rather, it means that "it is probable that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled."  *Lavie v. Proctor & Gamble Co.*, 105 Cal. App. 4th 496, 508 (2003).  Both statutes "prohibit not only affirmative misrepresentations, but also material omissions that deceive reasonable consumers."  *Doe v. SuccessfulMatch.com*, 70 F. Supp. 3d 1066, 1075 (N.D. Cal. 2014).  "California courts . . . have recognized that whether a business practice is deceptive will usually be a question of fact not appropriate for decision on demurrer [or a motion to dismiss]."  *Williams*, 552 F.3d at 938; *see also Reid v. Johnson & Johnson*, 780 F.3d 952, 959 (9th Cir. 2015) ("[The reasonable consumer standard] raises questions of fact that are appropriate for resolution on a motion to dismiss only in rare situation[s]." (citation and internal quotation marks omitted)).

Aegis's prime attack on Plaintiffs' CLRA and UCL claim is that Plaintiffs have failed to allege that "Aegis made any representations to residents about its staffing levels or the method by which Aegis sets staffing levels prior to their admission into the community."  (Dkt. No. 25, Mot. at 8:17-19.)  Aegis thus concludes that without such "express statements . . . which refer to specific staff assignments . . . or actual care time owed to the residents . . . , a reasonable consumer would not conclude that Aegis expressly or impliedly promised . . . to use resident assessments to set staffing."  (Dkt. No. 41, Reply at 5:3-7.)  In a technical sense, Aegis is correct insofar as none of the representations identified by Plaintiffs in the SAC reference facility staffing or assert how staffing is or will be determined.

However, the CLRA and UCL do not require that a defendant make a blatant falsehood before a plaintiff may state a claim.  Rather, the statutes only require that a statement or representation be likely to deceive a reasonable consumer.  Thus, "[a] true representation can mislead a reasonable consumer if it is actually misleading or has the capacity, likelihood or tendency to deceive or confuse members of the public."  *Anderson v. The Hain Celestial Group, Inc.*, 87 F. Supp. 3d 1226, 1236 (N.D. Cal. 2015); *see also Rezner v. Bayerishe Hypo-Und Vereinsbank AG*, No. 06-cv-02064 JW, 2011 WL 6329854, at *3 (N.D. Cal. Nov. 8, 2011) ("A

6

1    statement may be actionable under the UCL even if technically true, if failure to disclose other
2    material information relating to the statement renders it misleading."). Thus, courts have
3    permitted CLRA and UCL claims to proceed past the pleading stage where a factually true
4    statement nonetheless gave a false or misleading impression. *See, e.g.*, *Swearingen*, 2017 WL
5    1806483, at *5; *Thesier-Hendricks v. TJL Enters., Inc.*, No. 15-cv-00477-JAK, 2015 WL
6    10791893, at *8 (C.D. Cal. Aug. 3, 2015); *O'Shea v. Epson Am., Inc.*, 09-cv-8063-PSG, 2011 WL
7    3299936, at *9 (C.D. Cal. July 29, 2011); *Red v. Kraft Foods, Inc.*, 10-cv-1028-GW, 2011 WL
8    938297, at *4 (C.D. Cal. Jan. 13, 2011).

9    Here, the various statements enumerated in the SAC clearly represent to prospective or
10   current residents that there is a connection between the services they will receive and the care
11   points assessed under resident assessment system. For example, the portion of the Residence
12   Agreement quoted in the SAC expressly tells prospective residents that he or she will "receive
13   services appropriate to [his or her] individual need." (SAC ¶ 29.) The preceding two sentences,
14   however, tell the resident that Aegis will "determine the services that [the resident] may require,"
15   through a "comprehensive assessment" and reassessments (*i.e.*, the resident assessment system).
16   (*Id.*) The Residence Agreement therefore implies, rather directly, that the services a resident
17   receives will be based on, or influenced by, the resident assessment system. This understanding is
18   reinforced by the binder and Individualized Service Plans provided to residents by Aegis. The
19   binder explains that the resident assessment plan is employed because of a belief that "residents
20   should only be charged for the services they need and receive" and that points are assessed "based
21   on the average amount of staff time required to provide that service, the frequency, and the cost of
22   the staff person that will be performing the task." (*Id.* ¶ 32.) The Individualized Service Plan goes
23   further, by actively describing a task the resident needs, the points assessed for the task, and the
24   type of staff who will carry out the task. (*Id.* ¶ 31.)

25   Even though these alleged statements make no express connection between the resident
26   assessment system and facility staffing levels, the statements are nonetheless subject to the
27   reasonable inference that Aegis would consider the resident assessment system in setting staffing
28   levels. *See Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001) ("In deciding [a motion to

7

dismiss], all material allegations of the complaint are accepted as true, as well as all reasonable inferences to be drawn from them."). The statements allegedly made by Aegis reassure prospective and current residents that should their needs change, the resident assessment system would be used to make sure that they continued to receive the services and assistance they need. Based these representations, therefore, a reasonable consumer could expect that, as their needs increased, Aegis would devote an increased amount of staff time to him or her to ensure those needs are met. This expectation necessarily carries with it the understanding that Aegis would consider the results of its resident assessment system in determining facility staffing levels. Services can only be provided by staff, and if a facility residents' needs increase, staffing would necessarily have to be adjusted in one way or another.

This reasonable expectation created by Aegis's representations is contradicted by Aegis's alleged practice of employing a fixed staffing policy that does not consider fluctuating resident needs but is instead driven primarily by profit and budgetary concerns. (*See* SAC ¶¶ 40-47.) Contrary to Aegis's assertion, there is nothing illogical or implausible about Plaintiffs' theory of recovery.

The Court finds this case analogous to *Winans by and through Moulton v. Emeritus Corp.*, No. 13-cv-03962-SC, 2014 WL 970177 (N.D. Cal. Mar. 5, 2014). There, Plaintiff alleged that the defendant, an assisted living provider, falsely represented that its "resident evaluation process" (called "wE Care") would be used to set staffing. *Id.* at *2. In reality, defendant allegedly "staff[ed] its facilities based on profit margins, without regard for resident need." *Id.* The representations made by the defendant in *Winans* largely track the alleged representations made by Aegis in this case. In rejecting the defendant's motion to dismiss plaintiff's CLRA claim and finding that the defendant had a duty to disclose the manner in which it determined facility staffing, the court held:

> Defendant represents that it will provide different levels of care depending on a resident's needs, that it will develop a service plan based on the resident's evaluation, and that residents will receive services appropriate to their individual needs. These representations are contradicted by facts Defendants allegedly failed to disclose: that Defendant does not use evaluations to set staffing levels, but sets them using predetermined corporate labor budgets.

8

1    *Id.* at *9.  The same observations apply with equal force to this case.  Aegis argues, however, that

2    *Winans* is distinguishable because the "wE Care" system was more "time-based" and "explicitly

3    promised residents a certain number of care hours per week" compared to Aegis's "care points"

4    system.  The Court finds this distinction unpersuasive.  The fact remains that Aegis represented to

5    residents that they would receive care from staff based on their individual need and that this need

6    would be determined by a resident assessment system which assigned "care points" to a task based

7    on the time (and cost) associated with staff providing that service.  Aegis's employment of a pre-

8    determined, fixed staffing system that does not consider the resident assessment system

9    contradicts these representations.

10   Aegis also argues that Plaintiffs' CLRA and UCL claims fail because Plaintiffs have not

11   satisfied Rule 9(b)'s heightened pleading requirement.  The Court disagrees.  Plaintiffs' have

12   alleged specifically: (1) the statements made by Aegis that are allegedly misleading (the "what"

13   and "who"); (2) why they believe the statements are misleading (the "how"); and (3) which

14   facilities the Plaintiffs reside or resided and during what time period (the "where" and "when").

15   Further, the named Plaintiffs all allege that they (or their representatives) understood Aegis's

16   representations to mean that as their needs increased, the staffing determined to be needed by the

17   resident assessment system would be provided to them.  They further allege that they relied on

18   these representations in deciding to move into an Aegis facility.  (*See, e.g.*, SAC ¶¶ 62, 64; 73; 76;

19   82.)  Plaintiffs, therefore, have adequately alleged reliance.  This is not a case where Aegis is left

20   to flail in the dark blindly against a vague allegation of fraudulent or misleading conduct.  While

21   Aegis may vehemently disagree with them, the allegations have been pleaded with sufficient

22   specificity to allow Aegis to respond.  *See Cooper*, 137 F.3d at 627 (to satisfy Rule 9(b), "the

23   complaint [must] identif[y] the circumstances of the alleged fraud so that defendants can prepare

24   an adequate answer" (internal quotation marks omitted)).

25   Given the above, the Court concludes that Plaintiffs have adequately alleged that

26   reasonable consumers are likely to be deceived by Aegis's representations regarding the resident

27   assessment system and the way it is used to provide services to residents.  *Williams*, 552 F.3d at

28   938.  This is not the "rare situation" where the "reasonable consumer" test can be resolved in a

motion to dismiss. *Id.* at 939. Thus, under either an affirmative representation theory or an omission theory, the Court concludes that Plaintiffs have stated a claim for violation of the CLRA and UCL. *See Collins v. eMachines, Inc.*, 202 Cal. App. 4th 249, 255 (2011) (failure to disclose a fact can be deceptive where, *inter alia*, the "defendant makes partial representations that are misleading because some other material fact has not been disclosed").

**C.  Plaintiffs Have Adequately Alleged a Claim for Elder Financial Abuse.**

Plaintiffs' fourth cause of action is for "elder financial abuse." Under California Welfare and Institutions Code § 15610.30, "'[f]inancial abuse' of an elder" occurs when, *inter alia*, a person or entity "[t]akes, secretes, appropriates, obtains, or retains real or personal property of an elder . . . for a wrongful use or with intent to defraud, or both." *Id.* § 15610.30(a)(1). In its motion to dismiss, Aegis makes no argument specifically directed at this cause of action. Instead, it generally includes the elder financial abuse claim in its argument that Plaintiffs have failed to meet the Rule 9(b) heightened pleading requirement. For the reasons discussed above, the Court finds that Plaintiffs' allegations comply with Rule 9(b), and the Court therefore DENIES Aegis's motion to dismiss Plaintiffs' cause of action under California Welfare and Institutions Code § 15610.30.

**CONCLUSION**

For the reasons set forth herein, the Court DENIES Aegis's motion to dismiss Plaintiffs' Second Amended Class Action Complaint.

The Court HEREBY SETS an initial case management conference in this action for Friday, July 28, 2017 at 11:00 A.M., in Courtroom 5, 2nd Floor, Federal Courthouse, 1301 Clay Street, Oakland, California.

The parties shall appear in person through lead counsel to discuss all items referred to in this Order and with authority to enter stipulations, to make admissions, and to agree to further scheduling dates.

The parties shall file a joint case management statement no later than **five (5) court days** prior to the conference. The joint case management statement shall address all of the topics set forth in the Standing Order for All Judges of the Northern District of California - *Contents of Joint*

1 *Case Management Statement*, which can be found on the Court's website located at
2 http://www.cand.uscourts.gov. *See* N.D. Civ. L.R. 16-9.  Any request to reschedule the date of the
3 conference shall be made in writing, and by stipulation if possible, at least **ten (10) calendar days**
4 before the date of the conference and must be based upon good cause.  In order to assist the Court
5 in evaluating any need for disqualification or recusal, the parties shall disclose to the Court the
6 identity of any person, associations, firms, partnerships, corporations or other entities known by
7 the parties to have either (1) financial interest in the subject matter at issue or in a party to the
8 proceeding; or (2) any other kind of interest that could be substantially affected by the outcome of
9 the proceeding.  If disclosure of non-party interested entities or persons has already been made as
10 required by Civil L.R. 3-16, the parties may simply reference the pleading or document in which
11 the disclosure was made.  In this regard, counsel are referred to the Court's Recusal Order posted
12 on the Court website at the Judges Information link at http://www.cand.uscourts.gov.
13 　　　　The parties' joint administrative motion to schedule a case management conference (Dkt.
14 No. 50) is DENIED as moot.
15 　　　　**IT IS SO ORDERED.**
16 Dated: May 18, 2017

_____
JEFFREY S. WHITE
United States District Judge

11