Kathryn A. Stebner, State Bar No. 121088
**STEBNER AND ASSOCIATES**
870 Market Street, Suite 1212
San Francisco, CA 94102
Tel: (415) 362-9800
Fax: (415) 362-9801

Guy B. Wallace, State Bar No. 176151
**SCHNEIDER WALLACE COTTRELL KONECKY LLP**
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Tel:   (415) 421-7100
Fax:   (415) 421-7105

[Additional counsel listed on service list]

Attorneys for Plaintiffs and the Proposed Class

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA - OAKLAND

| | |
|---|---|
| June Newirth, by and through her Guardian ad Litem, Frederick J. Newirth; Barbara Feinberg; and Elizabeth Barber, Andrew Bardin, and Thomas Bardin as successors-in-interest to the Estate of Margaret Pierce; on their own behalves and on behalf of others similarly situated,<br><br>                Plaintiffs,<br><br>vs.<br><br>Aegis Senior Communities, LLC, dba Aegis Living; and Does 1 Through 100,<br><br>                Defendants. | CASE NO.  **4:16-cv-03991-JSW**<br><br>**CLASS ACTION**<br><br>**NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:   May 7, 2021<br>Time:   9:00 a.m.<br>Place:  Courtroom 5, 2nd Floor<br>Judge:  Hon. Jeffrey S. White<br><br>Action Filed: April 12, 2016<br>Trial Date: None Set |

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD, PLEASE TAKE NOTICE that on May 7, 2021, at 9:00 a.m., or as soon thereafter as this matter may be heard in Courtroom 5, 2nd Floor, before the Honorable Jeffrey S. White of the above-entitled court, located at 1301 Clay Street, Oakland, California, 94612, Plaintiffs will, and hereby do, move the Court for preliminary approval of the parties' class settlement.[1]

Plaintiffs respectfully move the Court for an Order [1] preliminarily approving the Settlement Stipulation in this action pursuant to Federal Rule of Civil Procedure 23(e); [2] preliminarily certifying a Settlement Class pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3); [3] appointing Plaintiffs' attorneys as Settlement Class Counsel; [4] appointing Named Plaintiffs as Settlement Class Representatives; [5] approving the parties' proposed forms of notice and notice program and directing that notice be disseminated pursuant to this program; and [6] setting a Fairness Hearing and certain other dates in connection with the final approval of the Settlement.

The motion is based upon this notice of motion and motion, the accompanying memorandum of points and authorities, the declaration of Kathryn Stebner, the Stipulation of Settlement, Amendment to the Stipulation of Settlement, the Notice of Lodgment filed concurrently herewith, the [Proposed] Order Preliminarily Approving Class Action Settlement, the pleadings on file in this action, and such other matters that may be brought to the Court's attention at or before the hearing.

_____

[1] Pursuant to the Court's Order Vacating Status Conference and Instructions to Parties (Dkt. 200), the parties are concurrently filing a Stipulated Motion to Amend the Scheduling Order, For Leave to File Third Amended Complaint, and For Permissive Joinder.  By this stipulated motion to amend, the parties respectfully move this Court pursuant to Federal Rules of Civil Procedure 15, 16, and 20, for an Order: (1) amending the operative scheduling order to (2) permit Plaintiffs leave to file an amended complaint, (3) in order to permit the joinder of Carol Morrison to this action as an additional named Plaintiff and class representative and to add the Washington settlement class members as a subclass to this California action. The purpose of this stipulated motion to amend is to effectuate the parties' global settlement of this matter together with the related but the separate lawsuit pending in the King County Superior Court in Washington, *Morrison v. Aegis Senior Communities, LLC,* Case No. 18-2-06326-4 SEA (the "Washington Action"), which the parties are presenting for preliminary approval herein.

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ........................................................................2

POINTS AND AUTHORITIES..............................................................................1

I.      INTRODUCTION.........................................................................................1

II.     BACKGROUND............................................................................................2

     A.      Case Overview .................................................................................2

     B.      Case Proceedings.............................................................................3

     C.      Case Investigation and Discovery ..................................................4

     D.      Parties' Settlement Negotiations Result In Agreement ................5

III.    THE PROPOSED SETTLEMENT WILL BENEFIT THE CLASS ...................6

     A.      The Settlement Fund .......................................................................6

     B.      Settlement Payments to Class Members .........................................6

     C.      Stipulated Injunction ......................................................................9

     D.      Release Provisions.........................................................................10

     E.      Class Notice and Settlement Administration Costs......................11

     F.      Payment of Service Awards, Attorneys' Fees and Litigation Costs ......11

IV.     THE SETTLEMENT SATISFIES THE LEGAL STANDARDS FOR
     OBTAINING PRELIMINARY APPROVAL ..................................................12

     A.      The Settlement Is Entitled to A Presumption of Fairness ..........14

     B.      The Settlement Is Fair Given the Settlement Benefits And The Risks
        Associated With Continued Litigation. ....................................15

        1.      The Settlement Will Result in Substantial Benefits to the Class ...............15

        2.      The Litigation Risks Support Preliminary Approval ................18

     C.      The Proposed Attorneys' Fees, Litigation Expenses and Service Awards
        Are Within The Range of Reasonableness..................................19

V.      PRELIMINARY CERTIFICATION OF THE SETTLEMENT CLASS IS
     WARRANTED ................................................................................................21

VI.     THE FORM AND MANNER OF CLASS NOTICE SHOULD BE APPROVED ............24

VII.    CONCLUSION .............................................................................................24

1

# TABLE OF AUTHORITES

2

**Cases**

3

*Amchem Products, Inc. v. Windsor*
  521 U.S. 591 (1997) ................................................................................................ 21

4

*Bickley v. Schneider Nat'l Carriers, Inc.*
  2016 U.S. Dist. LEXIS 167144 ............................................................................. 21

5

6

*Boeing Co. v. Van Gemert*
  444 U.S. 472 (1980) ................................................................................................ 20

7

*Boyd v. Bechtel Corp.*
  485 F. Supp. 610 (N.D. Cal. 1979) ....................................................................... 15

8

*Carnes v. Atria Senior Living*
  No. 3:14-cv-02727-VC (N.D. Cal. 2016) .............................................................. 17

9

10

*Churchill Village, L.L.C.  v. Gen.  Elec.*
  361 F.3d 566 (9th Cir. 2004) ........................................................................... 12, 23

11

*Cicero v. DirectTV, Inc.*
  2010 WL 2991486 (C.D. Cal. July 27, 2010) ....................................................... 20

12

13

*Class Plaintiffs v. City of Seattle*
  955 F.2d 1268 (9th Cir. 1992) ................................................................................ 12

14

*Ellis v. Naval Air Rework Facility*
  87 F.R.D. 15 (N.D. Cal. 1980) ......................................................................... 14, 15

15

16

*Garner v. State Farm Mut. Auto. Ins. Co.*
  2010 WL 1687832 (N.D. Cal. Apr. 22, 2010) ...................................................... 21

17

*Graciano v. Robinson Ford Sales, Inc.*
  144 Cal.App.4th 140 (2006) ................................................................................... 20

18

19

*Hanlon v. Chrysler Corp.*
  150 F.3d 1011 (9th Cir. 1998) ..................................................................... 13, 21, 22

20

*In Re Armored Car Antitrust Litig.*
  472 F. Supp. 1357 (N.D. 1979) .............................................................................. 17

21

22

*In re Mego Fin. Corp. Sec. Litig.*
  213 F.3d 454 (9th Cir. 2000) .................................................................................. 16

23

*In re Omnivision Techs.*
  559 F. Supp. 2d 1036 (N.D. Cal. 2007) ................................................................ 17

24

25

*In re Tableware Antitrust Litig.*
  484 F. Supp. 2d 1078 (N.D. Cal. 2007) ................................................................ 13

26

*Ingalls v. Hallmark Mktg. Corp.*
  Case No. 08cv4342 (C.D. Cal. Oct. 16, 2009) ..................................................... 20

27

28

ii

*Knight v. Red Door Salons, Inc.*
  2009 WL 248367 (N.D. Cal. Feb. 2, 2009) ...................................................................... 20

*Lealao v. Beneficial California, Inc.*
  82 Cal. App. 4th 19 (2000) ............................................................................................... 20

*Lerwill v. Inflight Motion Pictures, Inc.*
  582 F.2d 507 (9th Cir. 1978) ............................................................................................ 23

*Linney v. Cellular Alaska Partnership*
  1997 WL 450064 (N.D.  Cal. July 18 1997) ........................................................... 15, 17, 18

*Mendoza v. U.S.*
  623 F.2d 1338 (9th Cir. 1980) .......................................................................................... 24

*Officers for Justice v. Civil Serv. Comm'n*
  688 F.2d 615 (9th Cir. 1982) ...................................................................................... 12, 16

*Ozga v. U.S. Remodelers, Inc.*
  2010 U.S. Dist. LEXIS 91196 ........................................................................................... 21

*Razilov v. Nationwide Mut. Ins. Co.*
  2006 WL 3312024 (D. Or. Nov. 13, 2006) ....................................................................... 21

*Serrano v. Priest (Serrano III)*
  20 Cal.3d 25 (1977) .......................................................................................................... 20

*Singer v. Becton Dickinson and Company*
  2010 WL 2196104 (S.D. Cal. June 1, 2010) ..................................................................... 20

*Trombley v. Nat'l City Bank*
  759 F. Supp .2d 20 (D.D.C, 2011) .................................................................................... 17

*Valentino v. Carter-Wallace, Inc.*
  97 F.3d 1227 (9th Cir. 1996) ............................................................................................ 21

*Van Bronkhorst v. Safeco Corp.*
  529 F.2d 943 (9th Cir. 1976) ............................................................................................ 13

*Wal-Mart Stores, Inc. v. Dukes*
  131 S. Ct.  2541 (2011) ..................................................................................................... 22

*Walsh v. Kindred Healthcare, et al.*
  2013 U.S. Dist. LEXIS 176319 ........................................................................................ 20

*Winans et al. v. Emeritus et al.*
  2016 U.S. Dist. LEXIS 3212 (N.D. Cal. 2016) ................................................................ 17

**Statutes**
Bus. & Prof. Code § 17200 ...................................................................................................... 2
Cal. Civ. Code § 1750 .............................................................................................................. 2
Cal. W&I Code § 15610.30 ...................................................................................................... 2

**Rules**
FRCP 23(b) .............................................................................................................................. 21
N.D. Cal. Proc. Guid., Rule 6 ................................................................................................. 19

iii

Rule 23(a)(1) .................................................................................................................. 21

1

## POINTS AND AUTHORITIES

2  ## I.     INTRODUCTION

3       Plaintiffs respectfully request that the Court enter an order preliminarily approving the

4  parties' class settlement in this action, reached after arms-length multiple settlement negotiations

5  supervised by neutral mediators.  In addition to injunctive relief, the settlement provides

6  substantial monetary payments to a settlement class of approximately 10,069 current and former

7  residents of assisted living facilities owned, managed and/or operated by Aegis Senior

8  Communities, LLC, dba Aegis Living ("Defendant") in California and Washington.[2]

9       This case is based on allegations that Defendant misleadingly failed to disclose that

10 resident assessments performed by its personnel would not be used to set facility staffing, but

11 instead that Defendant failed to disclose that staffing is primarily determined by labor budgets and

12 profit objectives. Defendant disputes these allegations in their entirety, denies any legal liability

13 and vigorously defended the case since the initial complaint was filed on April 12, 2016.  The lead

14 claim for monetary relief in the lawsuit has been the recovery of the approximately $54 million in

15 Community Fees paid by Defendant's residents in California and Washington. Under Plaintiffs'

16 case theory, the Community Fees would not have been paid had residents known the "true" facts

17 that resident assessments are not used to set facility staffing. Unlike other charges—such as care

18 fees as to which residents arguably received some value for services rendered— the Community

19 Fees arguably are the least likely to be affected by Defendant's offset and related defenses.

20       After substantial discovery and law-and-motion and four formal mediation proceedings,

21 the parties reached a settlement to resolve the case.  Specifically, Defendant has agreed to pay

22 $16.25 million (the "Settlement Fund") in full settlement of all claims. Subject to Court approval

23 of Plaintiffs' application for attorneys' fees, litigation costs, service awards to the Named

24 _____

25 [2] 5,615 of the Settlement Class Members are in California, and 4,454 are in Washington. The
   proposed Settlement Class is readily ascertainable, and Defendant has agreed to provide the

26 Settlement Administrator with a list of all Class Members from existing records.   The Settlement
   Class defined by the Settlement Stipulation mirrors the Class proposed in the Third Amended

27 Complaint.  (See Northern District of California Procedural Guidance for Class Action
   Settlements ("N.D. Cal. Proc. Guid."), Rule 1(a).)

28

Plaintiffs, and factoring in estimated notice and administration expenses, it is anticipated that approximately $8.395 million will be available to fund payments to Settlement Class members. That translates to an average per-resident payment of approximately $950 for the California Subclass and $1,550 for the Washington Subclass.  In addition to the Settlement Fund, the settlement includes substantial injunctive relief. Among other terms, the Injunction requires Defendant to provide staffing levels sufficient to provide current residents with the care services set forth in their service plans at their California and Washington assisted living facilities, which addresses the crux of this case.  As detailed below, the Settlement falls well within the "range of reasonableness." For these and other reasons, this motion for preliminary approval of the parties' Stipulation of Settlement ("SS" or "Settlement Stipulation") should be granted.[3]

## II.    **BACKGROUND**

### A.    **Case Overview**

On April 12, 2016, the California Named Plaintiffs June Newirth, by and through her successor-in-interest, Kathi Troy; and Elizabeth Barber, Andrew Bardin, and Thomas Bardin as successors-in-interest to the Estate of Margaret Pierce, on behalf of themselves and all others similarly situated (together, "California Named Plaintiffs") filed this action against Defendant. Filed as a putative class action, the lawsuit sought relief on behalf the California Named Plaintiffs and all persons who resided in any of Defendant's California assisted living facilities since April 12, 2012.  The California Named Plaintiffs asserted claims for damages and other relief under California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.* ("CLRA"), California's unfair competition statute, Bus. & Prof. Code §§ 17200 et seq. ("UCL") and the Financial Elder Abuse statute, Cal. W&I Code § 15610.30 (collectively, the "California Claims").

On March 8, 2018, the Washington Named Plaintiff Carol M. Morrison by Stacy A. Van

---

[3] Defendant will ensure that CAFA notice requirements are met pertaining to the California Action within ten days of the filing of this Preliminary Approval Motion. Defendant will ensure that CAFA notice requirements for the Washington Action are met after the Court grants the concurrently filed Stipulated Motion for Leave to File Third Amended Complaint (which will join the Washington Action to this matter) and the amended complaint is filed. (*See* N.D. Cal. Proc. Guid., Rule 10.)

Vleck as Attorney-in-Fact on behalf of herself and all others similarly situated ("Washington Named Plaintiff") filed a putative class action complaint against Defendant in the Superior Court of Washington, County of King.  On October 15, 2018, the Washington Named Plaintiff filed a First Amended Complaint captioned *Carol M. Morrison, et al. v. Aegis Senior Communities, LLC, dba Aegis Living*, case no. 18-2-06326-4-SEA ("Washington Action"), for claims arising under Washington's Consumer Protection Act ("CPA", RCW 19.86.020) and Financial Exploitation of Vulnerable Adults Statute (RCW 74.34.020, 74.34.200) (collectively, the "Washington Claims"). The Washington Action sought relief on behalf the Washington Named Plaintiff and all persons who resided in any of Defendant's Washington assisted living facilities since March 8, 2014.

The crux of Plaintiffs' cases in California and Washington is that Defendant allegedly misled residents, family members, and the public to believe that resident assessments would be used to determine staffing at Aegis' facilities. (Third Amended Complaint, Dkt. No. *TBD*, "TAC", ¶¶ 2-8.)  Plaintiffs allege that facility staffing is not determined by resident assessments but instead is based primarily on labor budgets and pre-determined profit objectives.  Defendant denies the allegations and claims in the case in their entirety and denies any wrongdoing whatsoever. Defendant denies that the case is appropriate as a class action for purposes of litigation. Defendant agreed to settle to avoid continued burdensome and costly litigation.

## B.    Case Proceedings

The California and Washington Actions have been vigorously litigated from inception.  In the California Action, following Plaintiffs' amendment to the initial complaint, Defendant removed to Federal Court on July 14, 2016.  On July 21, 2016, Defendant filed a Motion to Compel Arbitration and Dismiss Class Claims and a Motion to Dismiss the First Amended Class Action Complaint.  On August 24, 2016, the California Named Plaintiffs filed a Second Amended Complaint.  On September 21, 2016, Defendant filed a Motion to Dismiss the Second Amended Class Action Complaint.  On May 18, 2017, the District Court denied Defendant's Motion to Dismiss the Second Amended Class Action Complaint.  On July 28, 2017, Defendant renewed its Motion to Compel Arbitration and Dismiss Class Claims.  On September 29, 2017, the District Court denied

Defendant's renewed Motion to Compel Arbitration and Dismiss Class Claims.  On October 27, 2017, Defendant filed a Notice of Appeal and Motion to Stay Pending Appeal.  On November 21, 2017, the District Court denied Defendant's Motion to Stay Pending Appeal.  On July 24, 2019, the United States Court of Appeals for the Ninth Circuit affirmed the District Court's order denying Defendant's Motion to Compel Arbitration.  On September 10, 2019, Defendant answered the Second Amended Complaint, wherein Defendant expressly denied the allegations and claims alleged in the Second Amended Complaint.  On October 4, 2019, Defendant filed a Motion to Strike Class Definition or to Deny Class Certification in the alternative.  On October 18, 2019, Defendant filed a Motion for Summary Judgment.  On October 21, 2019, the California Named Plaintiffs filed a Motion for Class Certification.  The District Court subsequently granted the stipulated requests by the California Named Plaintiffs and Defendant (together, "California Parties") to continue the hearings on the Motion for Class Certification and Motion for Summary Judgment.  When the California Parties notified the District Court about this settlement on July 23, 2020, the District Court denied, without prejudice, the Motion for Class Certification, Motion for Summary Judgment, Motion to Strike the Class Definition or Deny Class Certification, subject to renewal if this settlement is not consummated.

In the Washington Action, following Plaintiff's amendment to the initial complaint, Defendant filed a Motion to Deny Class Certification on October 17, 2019.  By order dated May 1, 2020, the Washington state court (Hon. Marshall Ferguson) denied Defendant's motion.  On October 25, 2019, Defendant answered the First Amended Complaint, wherein Defendant expressly denied the allegations and claims alleged in the First Amended Complaint.

To date, a litigation class is yet to be certified in the California or Washington Actions.  (*See* N.D. Cal. Proc. Guid., Rule 1.)

### C.      Case Investigation and Discovery

Prior to reaching a settlement, Plaintiffs engaged in substantial investigation and discovery.  In the California Action, those efforts included extensive review of public documents prior to the filing of the lawsuit, written and deposition discovery, including written discovery responses

exchanged between the parties, Defendant's production of approximately 132,483 pages of documents, including approximately 621 Excel files, and eleven depositions, including Defendant's executive and facility-level personnel, and designated Persons Most Knowledgeable, the Plaintiffs' experts, and two witnesses knowledgeable about the claims of the California Named Plaintiffs; as well as data intensive discovery resulting in the production of electronic employee payroll data as well as meet and confer efforts among Defendant and its resident assessment software vendor to obtain Defendant's electronic resident assessment data. (Stebner Decl., ¶22.)

In the Washington Action, those efforts included extensive review of public documents prior to the filing of the lawsuit, extensive written and deposition discovery, including written discovery responses exchanged between the parties, Defendant's production of approximately 82,063 pages of documents, including 3,667 Excel and native files, and the depositions of three witnesses, including the Class Representative in this action; as well as data intensive discovery resulting on the production of electronic employee payroll data and resident assessment data. (Stebner Decl., ¶23.)  The electronic payroll and assessment data was used by Plaintiffs' staffing experts to undertake a "shortfall" analysis regarding sample facilities in California and Washington. (Stebner Decl., ¶24.)

Additionally, Plaintiffs in both actions engaged in extensive meet and confer efforts, motion practice, and discovery hearings to obtain Defendant's documents and interrogatory responses.  (Stebner Decl., ¶25.)

**D.     Parties' Settlement Negotiations Result In Agreement**

The global settlement agreement for the Californian and Washington Actions was reached as a result of extensive arm's length negotiations through parties' counsel. This included a full-day mediation of the California Action on May 29, 2018 before the Honorable Ronald Sabraw (ret.) of JAMS in San Jose, California; a second full-day mediation of the California Action on October 2, 2018 before the Honorable Ronald Sabraw (ret.) of JAMS in San Jose, California; a full-day joint mediation of the California Action and Washington Action on October 22, 2019 before the Honorable Bruce Hilyer (ret.) of Hilyer Dispute Resolution in Seattle, Washington; and a full-day

joint mediation of the California Action and Washington Action on March 24, 2020 before the

Honorable Rebecca Westerfield (ret.) of JAMS in San Francisco, California.  Although the case

did not resolve at the mediation session with Judge Westerfield, the parties continued settlement

efforts, which led to this settlement.  (Stebner Decl., ¶26.)

### III.    THE PROPOSED SETTLEMENT WILL BENEFIT THE CLASS

The parties' Stipulation of Settlement and Amendment to the Stipulation of Settlement are

attached as Exhibit "A" to the Notice of Lodgment ("NOL").  The key settlement terms are:

### A.    The Settlement Fund

Defendant has agreed to pay $16.25 million to resolve all monetary obligations owed

under the settlement.  In addition to the Settlement Awards paid to Settlement Class Members, the

Fund will be used to pay notice/administration costs (not to exceed $105,000), service awards of

$15,000 to each Named Plaintiff (totaling $75,000), reimbursement of litigation expenses not to

exceed $1.3 million, and Plaintiffs' attorneys' fees in the amount approved by the Court but not

exceed $6.35 million.  Factoring in an agreed-upon reserve of $25,000 to cover late claims, the

estimated amount available to fund payments to class members is roughly $8.395 million.[4]

(Stebner Decl., ¶27.) Significantly, there will be no reversion of any portion of the Settlement

Fund to Defendant.  (*See* N.D. Cal. Proc. Guid., Rule 1(h).)  Rather, unused reserve funds as well

as uncashed or returned checks will be used to fund a second round of Settlement Awards to

identified class members.  Alternatively, if the remaining amounts make a second distribution

economically impractical, the balance will be distributed to a *cy pres* recipient, nominated by

Plaintiffs' Counsel and approved by the Court.  (SS, ¶7.9; Stebner Decl., ¶28.)[5]

### B.    Settlement Payments to Class Members

The Agreement provides for cash payments to Settlement Class Members (or if deceased,

---

[4] The work to develop the case theory and litigate the California Action, including without limitation work performed by Plaintiffs' Counsel, the Named Plaintiffs, and Plaintiffs' experts, inured to the benefit of the Washington Action. (Stebner Decl., ¶51.)

[5] The proposed cy pres recipient is Groceries for Seniors, a non-profit based in San Francisco providing free food to poor, elderly people. The parties and their counsel have no relationship with the proposed cy pres recipient.  (Stebner Decl., ¶28; *see* N.D. Cal. Proc. Guid., Rule 8.)

1   their legal successors) on a direct distribution basis, with no claim form requirement.  (*See* N.D.

2   Cal. Proc. Guid., Rules 1(f) and (g).)  The parties estimate the Settlement Class consists of

3   approximately 10,069 current and former residents. (Stebner Decl., ¶29.) The Settlement

4   Administrator proposed by the parties (CPT Group, Inc.[6]) will mail settlement checks to each

5   Settlement Class Member for whom a valid address has been provided by Defendant (or located

6   through the address update procedures). For Settlement Class Members without a locatable current

7   addresses, the Administrator is authorized to make payment based on a "distribution request" by

8   the class member (or a legal successor or successor-in-interest).[7] (SS, ¶ 7.8.)

9        Subject to Court approval, the cash payments to Settlement Class Members will be

10   calculated by category of Community Fee payment as follows:

11        1.  <u>Community Fee Payments of $500 or More</u>: Settlement Class Members who paid a net
         Community Fee of $500 or more and Settlement Class Members for whom Community
12        Fee Information is unavailable shall each be entitled to a Settlement Award calculated
         as follows. The Settlement Administrator shall first calculate a Settlement Payment
13        Percentage ("SPP") by dividing the Net Settlement Fund (less the amounts allocated
         for the No Community Fee Paid group per paragraph 3 below) by the total amount of
14        net Community Fees paid by all Settlement Class Members including Settlement Class
         Members for whom Community Fee Information is unavailable. Next, the SPP shall be
15        applied against the Community Fee paid by or on behalf of each Settlement Class
         Member and the reduced average net Community Fee assigned to each Settlement
16        Class Member for whom Community Fee Information is unavailable, to derive the
         Settlement Award amount for each such Settlement Class Member. (*See* SS, ¶7.2 and
17        Amendment to SS, ¶7.6; Stebner Decl., ¶32.)

18        Defendant's data showed a total of $53,187,315.75 in Community Fees were paid by or on

20   _____

21   [6] With over thirty years of experience, CPT Group, Inc., has administered thousands of complex
     class action cases and billions of dollars in settlement funds.  CPT Group, Inc., has extensive
22   knowledge of complex class action settlement notice programs and are known for their quality of
     work, timeliness, and competitive pricing.  The parties reviewed proposals from two potential
23   settlement administrators for the same notice and claims administration process and selected CPT
     Group for their experience and competitive pricing.  In the last two years, Plaintiffs' counsel
24   engaged CPT Group for the settlement administration of one other class action, similarly against
     an assisted living facility chain in California, in *Lollock, et al. v. Oakmont Senior Living, LLC, et
25   al.*, Superior Court of California, County of Alameda, No. RG17875110.  (Stebner Decl., ¶30; *see*
     N.D. Cal. Proc. Guid., Rule 2; *see also* CPT Group, Inc.'s website at https://www.cptgroup.com.)

27   [7] The Settlement Administrator will have a standard procedure to ensure distribution requests and
     other communications (e.g., opt outs) are made by qualified Settlement Class Members or persons
28   authorized to act on their behalf.  (Stebner Decl., ¶31; *see* N.D. Cal. Proc. Guid., Rule 1(g).)

behalf of Settlement Class Members after November 1, 2010 ($25,262,684.77 or 47.5% in California and $27,924,630.93 or 52.5% in Washington). 6,230 Settlement Class Members (3,585 in California and 2,645 in Washington) paid a Community Fee of $500 or more after November 1, 2010.  Additionally, roughly $2,816,921.57 in Community Fees in California and $430,299.94 in Washington were paid by Settlement Class Members prior to November 1, 2010 as calculated per Paragraph 2 below. The Net Settlement Fund (less the amounts allocated for the No Community Fee Paid group per paragraph 3 below) is $8,236,500 ($3,912,571 in California and $4,323,929 in Washington). Accordingly, the SPP is approximately 13.9% for the California Subclass and 15.3% for the Washington Subclass. To illustrate, if a Settlement Class Member in Washington paid a Community Fee of $10,000, their estimated settlement payment is $1,525. The projected average settlement payment for the California Subclass is approximately $950, and $1,550 for the Washington Subclass. (Stebner Decl., ¶32.)

     2.  <u>Community Fee Payment of $0 to $499</u>: Settlement Class Members who paid a net $0 to $499 in Community Fees shall each be entitled to a Settlement Award in amount of $50.  (*See* SS, ¶¶7.2 and Amendment to SS, ¶7.6; Stebner Decl., ¶32.)

Per Defendant's data, 3,161 residents in the Settlement Class (1,493 in California and 1,668 in Washington) did not pay any Community Fees. An additional 9 Settlement Class Members (4 in California and 5 in Washington) paid less than $499.  (Stebner Decl., ¶32.)

     3.  <u>Community Fee Payments Made Pre-November 2010</u>: Settlement Class Members who paid Community Fees before November 2010 (and thus specific payment amounts are unavailable) shall each be entitled to a Settlement Award calculated as follows.  The Settlement Administrator shall calculate the average Community Fee paid by Settlement Class Members in 2011.  The Settlement Administrator shall divide the number of Settlement Class Members who paid no Community Fee by the number of Settlement Class Members for whom Community Fee Information is available, resulting in a percentage.  The Settlement Administrator shall reduce the average Community Fee paid in 2011 by that percentage.  The reduced average Community Fee amount shall be treated as the net Community Fee amount paid by each Settlement Class Member for whom Community Fee Information is unavailable for purposes of the calculation in paragraph 1 above.  (*See* SS, ¶7.2 and Amendment to SS, ¶7.6; Stebner Decl., ¶32.)

Defendant's data showed 678 Settlement Class Members in this group (537 in California and 141 in Washington). The average Community Fee paid in 2011 was $7,430.26 in California

1 and $4,976.29 in Washington. Per Paragraph 3 above, the reduced average Community Fee paid

2 by this group was $5,245.66 in California (totaling approximately $2,816,921.57) and $3,051.77

3 in Washington (totaling approximately $430,299.94). (Stebner Decl., ¶32.)

4      Before the distribution, the Administrator will recalculate the per-resident payment using

5 the actual number of class members located through Defendant's records, address updates and

6 Distribution Requests. From past experience, this will likely result in an increase in the per-resident

7 payment. The checks will be mailed within thirty (30) calendar days after the Effective Date as

8 defined in the Settlement Stipulation. Settlement Award checks not cashed within the 120-day

9 check cashing deadline (after reasonable reminders issued by the Administrator) shall be added to

10 the Reserve Fund. The Agreement authorizes the Administrator to hold a reserve of $25,000 to pay

11 late-submitted distribution requests or address other valid requests from Settlement Class Members.

12 Settlement Award checks not cashed within the check cashing deadline (after reasonable reminders

13 issued by the Administrator) shall be added to the reserve fund.  As stated, the Agreement provides

14 for a second potential distribution to identified Settlement Class Members after the initial

15 distribution and late claims process has been completed, assuming funds are left over in an amount

16 sufficient to make another distribution economically practical. (SS, ¶7.9; Stebner Decl., ¶¶33-34.)

17      As noted in the Settlement Stipulation and pursuant to Court Approval, the Escrow Agent

18 will safeguard, control, and maintain the Settlement Fund until the Effective Date.  For privacy

19 reasons, the names of Aegis' insurers, authorized agents, and certain security measures have been

20 redacted from the corresponding Escrow Agreement and Escrow Procedure Agreement, attached

21 as Exhibit 4 to the Settlement Stipulation.  (SS, ¶ 1.16 and Ex. 4 thereto; Stebner Decl., ¶35.)

22 Defendant's position is that the identification of entities funding and maintaining the Settlement

23 Fund is not material to the overall fairness of the settlement, given that the full settlement amount

24 will be funded after Preliminary Approval and prior to the opt-out/objection deadline.

25     **C.**    **Stipulated Injunction**

26      The Stipulation of Settlement also includes substantial non-monetary relief in the form of

27 the Stipulated Injunction, which subject to Court approval, will commence on the Effective Date

28

and remain in place for three years from that date.  (NOL, Ex. A(1) – Stipulated Injunction, ¶ 13; SS, ¶ 7.1).  Among other terms, the Injunction requires Defendant to adhere to disclosure requirements; to ensure continued compliance with all applicable regulations, including those related to provide staffing levels sufficient to provide current residents with the care services set forth in their service plans; to set staffing at its facilities based on Aegis's determination of the staffing hours reasonably required to perform the assessed care tasks needed by the residents as determined by Aegis's assessment procedures, the amount of time it takes to accomplish the given tasks, the experience and/or education of the staff, and the ability of staff to perform various tasks in parallel; and to implement an auditing process for Aegis to investigate and correct deviations from Aegis care standards.  (Stipulated Injunction, ¶¶ 1-10; Stebner Decl., ¶36.)  The terms of the Injunction address the alleged failures to provide sufficient staffing at Defendant's facilities. (Stebner Decl., ¶36.)  The Injunction references a Compliance Report Addendum, which Defendant contends includes proprietary information concerning Aegis' operations.  As such, the Compliance Report Addendum will be made available to any Settlement Class Member (or legal representative or successor-in-interest) who requests it but not otherwise publicly disclosed. (Injunction, ¶ 9; Stebner Decl., ¶37.)  All non-confidential settlement documents will be immediately available at the website.  The website will include a webpage stating that the confidential Injunction Compliance Report Addendum will be made available to any Settlement Class Member (or legal representative or successor-in-interest) upon request.

**D.      Release Provisions**

Under the Settlement Stipulation, the Named Plaintiffs and Settlement Class Members (excluding opt-outs) will release any and all actions, claims, demands, rights, suits, and causes of action of whatever kind or nature whatsoever that the Releasing Parties ever had, now have or hereafter can, shall, or may have against the Released Parties, including without limitation any and all damages, loss, costs, expenses, penalties, attorneys' fees and expert fees, and interest, whether known or unknown, suspected or unsuspected, asserted or unasserted, fixed or contingent, direct or indirect, whether sounding in tort or contract or any other legal theory, whether statutory,

1  administrative, common law or otherwise, however pled, wherever brought and whether brought

2  in law, equity or otherwise, arising out of or relating in any way or manner to the claims and

3  allegations asserted or that could have been asserted in either or both Actions based on the facts

4  alleged in the complaints in the California and/or Washington Actions; provided that the following

5  claims only are specifically excluded from this Release: (i) any individual claims for personal

6  injuries, wrongful death, bodily harm, or emotional distress resulting from said claims for personal

7  injuries, wrongful death or bodily harm; and (ii) claims based on a breach of the Settlement

8  Stipulation or the Injunction. Nothing in the Settlement Stipulation shall preclude any person or

9  entity from asserting any and all relevant allegations in support of a claim for personal injuries,

10  wrongful death, bodily harm, or emotional distress resulting from said personal injuries, wrongful

11  death or bodily harm, including without limitation, allegations that the facility was understaffed.

12  The releases are effective only after final approval and the Effective Date is reached.

13       **E.**     **Class Notice and Settlement Administration Costs**

14       The Settlement Stipulation provides dissemination of class notice to Settlement Class

15  Members by first class U.S. Mail and e-mail. To effectuate notice, Defendant will provide names

16  and contact information for all Settlement Class Members (and representatives/family members to

17  the extent available) to the Administrator, which will be updated through standard change of

18  address and other procedures. Any returned mail shall be re-sent after a skip trace is performed. In

19  addition to mailing and e-mailing, a summary form of the Court-approved class notice will be

20  published in the California and Washington editions of *USA Today* and posted on the settlement

21  website. The costs of class notice and settlement administration expenses, which the Settlement

22  Administrator estimates will not to exceed $105,000, will be paid from the Settlement Fund. (SS,

23  ¶¶ 1.36, 3.1, 3.2, 4.1, and 4.2; Stebner Decl., ¶39; NOL Ex. C; NOL Ex. B – CPT Group, Inc.'s

24  Proposal for Class Notice and Settlement Administration.)

25       **F.**     **Payment of Service Awards, Attorneys' Fees and Litigation Costs**

26       Subject to Court approval, the Settlement Stipulation provides for Service Awards to the

27  five Named Plaintiffs, collectively not to exceed $75,000. As will be established in detail in the

28

formal application for Service Awards, Named Plaintiffs devoted substantial time to the case prosecution, including with discovery, depositions, and/or settlement negotiations.

The Settlement Stipulation allows Plaintiffs to file an application for attorneys' fees not to exceed $6.35 million and litigation costs not to exceed $1.3 million. (SS, ¶¶ 1.4, 9.1, and 9.3.) There is no clear sailing provision on fees or costs in the Settlement Stipulation. Rather, it simply caps the maximum request that Plaintiffs can submit.  Plaintiffs will support the requested attorneys' fees and costs in a motion filed before the objection/opt-out deadline. Under the Settlement Stipulation, any monies not requested (or not approved) for fees and costs will be added to the Net Settlement Fund for payment to Settlement Class Members. (*See* SS, ¶¶ 7.2 and 7.3; Stebner Decl., ¶41.)

## IV.  THE SETTLEMENT SATISFIES THE LEGAL STANDARDS FOR OBTAINING PRELIMINARY APPROVAL

Judicial proceedings under Federal Rule of Civil Procedure 23 have led to a defined three-step procedure for approval of class action settlements:

(1)  Certification of a settlement class and preliminary approval of the proposed settlement after submission to the Court of a written motion for preliminary approval.

(2)  Dissemination of notice of the proposed settlement to the affected class members.

(3)  A formal fairness hearing, or final settlement approval hearing, at which class members may be heard regarding the settlement, and at which evidence and argument concerning the fairness, adequacy, and reasonableness of the settlement are presented.

Federal Judicial Center, Manual for Complex Litigation (4th ed. 2004), §§ 21.63, et seq. ("*Manual 4th*").  This procedure safeguards class members' procedural due process rights and enables the Court to fulfill its role as the guardian of class interests.  See 4 Newberg on Class Actions, § 11.22, et seq. (4th ed. 2002) ("*Newberg*").

The law favors the compromise and settlement of class-action suits.  *See, e.g.*, *Churchill Village, L.L.C.  v. Gen.  Elec.*, 361 F.3d 566, 576 (9th Cir. 2004); *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992); *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982).  The Ninth Circuit recognizes the "overriding public interest in settling

1  and quieting litigation . . . particularly . . . in class action suits . . ." *Van Bronkhorst v. Safeco*

2  *Corp.*, 529 F.2d 943, 950 (9th Cir. 1976).

3        "[T]he decision to approve or reject a settlement is committed to the sound discretion of

4  the trial judge because he is exposed to the litigants and their strategies, positions, and proof."

5  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998) (internal citations and quotations

6  omitted).  In exercising such discretion, the Court should give "proper deference to the private

7  consensual decision of the parties . . . .  [T]he court's intrusion upon what is otherwise a private

8  consensual agreement negotiated between the parties to a lawsuit must be limited to the extent

9  necessary to reach a reasoned judgment that the agreement is not the product of fraud or

10 overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a

11 whole, is fair, reasonable and adequate to all concerned."  *Id.* at 1027 (internal citations and

12 quotations omitted); *see also* Fed. R. Civ. P. 23(e).

13       At the preliminary approval stage, the Court need only find that the proposed settlement is

14 within the "range of reasonableness" such that dissemination of notice to the class, and the

15 scheduling of a fairness hearing, are worthwhile and appropriate.  4 *Newberg* § 11.25; *see also In*

16 *re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079-80 (N.D. Cal. 2007); *Young v. Polo*

17 *Retail, LLC*, 2006 WL 3050861, at *5 (N.D.  Cal. Oct. 25, 2006).  Preliminary approval of a

18 proposed class action settlement is appropriate where:

19         [T]he proposed settlement appears to be the product of serious, informed, non-
           collusive negotiations, has no obvious deficiencies, does not improperly grant
20         preferential treatment to class representatives or segments of the class, and falls
           within the range of possible approval[.]
21

22 *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d at 1079; see also, *Manual 4th* § 21.62

23 (preliminary approval involves an "initial evaluation" of the reasonableness and adequacy of

24 settlement;  reasonableness turns on "analysis of the class allegations and claims and the

25 responsiveness of the settlement to those claims" while adequacy involves a "comparison of the

26 relief granted to what class members might have obtained without using the class action process.")

27       The instant settlement clearly meets the requirements for preliminary approval.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**A.      The Settlement Is Entitled to A Presumption of Fairness**

Where a settlement is the product of arms-length negotiations conducted by capable and experienced counsel, the Court begins its analysis with a presumption that the settlement is fair and reasonable.  *See* 4 *Newberg* § 11.41; *Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980).  The facts support such a presumption here.

First, the Settlement Stipulation was reached through countless arms-length negotiations, which included four formal full-day mediations supervised by experienced neutrals, multiple conference calls and email exchanges that occurred over several years.  Those negotiations included mediations with Honorable Ronald Sabraw (ret.) on May 29, 2018 and October 2, 2018, with Honorable Bruce Hilyer (ret.) on October 22, 2019, and with Honorable Rebecca Westerfield (ret.) March 24, 2020.  The negotiations were hard-fought, with several instances where it appeared that the parties would not reach agreement. (Stebner Decl., ¶43.)

Second, Plaintiffs' Counsel here have extensive experience litigating and settling consumer class actions and other complex matters.  (Stebner Decl., ¶¶ 3-14, 44.)  They have investigated the factual and legal issues raised in this action, and that investigation informed the settlement negotiations.  As discussed above, the parties engaged in substantial discovery that collectively between the California and Washington Actions included a review of Defendant's production of over 214,546 pages of documents, including approximately 4,288 Excel and native files, and the depositions of fourteen witnesses, including Defendant's executive-level and facility-level personnel, and designated Persons Most Knowledgeable, the Plaintiffs' experts, Named Plaintiff and two witnesses with knowledge about the claims of the California Named Plaintiffs; as well as data intensive discovery resulting in the production of 89 Excel spreadsheets of employee payroll data as well as meet and confer efforts among Defendant and its resident assessment software vendor to obtain Defendant's resident assessment data which resulted in the production of an additional twelve data intensive Excel spreadsheets before reaching settlement.  Likewise, as discussed above, the pleadings were highly contested in both the Californian and Washington Actions.  These and other proceedings in the case produced a thorough vetting (pre-settlement)

1    of the factual and legal bases for Plaintiffs' claims and the key defenses to those claims.

2    (Stebner Decl., ¶44.)

3         The fact that qualified and well-informed counsel endorse the Settlement as being fair,

4    reasonable, and adequate weighs heavily in favor of approval.  *See Linney v. Cellular Alaska*

5    *Partnership*, 1997 WL 450064, at *5 (N.D.  Cal. July 18 1997); *Ellis v. Naval Air Rework*

6    *Facility*, 87 F.R.D. 15, 18 (N.D.  Cal. 1980); *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D.

7    Cal. 1979) ("The recommendations of plaintiffs' counsel should be given a presumption of

8    reasonableness.").

9    **B.     The Settlement Is Fair Given the Settlement Benefits And The Risks**

10   **Associated With Continued Litigation.**

11        Even without a presumption of fairness, the benefits of the proposed settlement clearly

12   warrant preliminary approval, particularly given the risks of continued litigation for the class.

13              **1.     The Settlement Will Result in Substantial Benefits to the Class**

14        Under the Agreement, Defendant has agreed to pay $16.25 million, of which

15   approximately $8.395 million will be available for distribution to Settlement Class Members.

16   Assuming that every Settlement Class Member is located for distribution of the payments, the

17   average Settlement Award will be roughly $950 for the California Subclass, and $1,550 for the

18   Washington Subclass.  If current addresses cannot be located for all potential class members (or

19   their successors), such that additional funds are available for distribution, the Settlement

20   Administrator will increase the per-class member payment. (SS, ¶ 7.9.)

21        The projected average Settlement Awards in California and Washington compare favorably

22   with the likely recovery if the case was tried.  The lead claim for monetary relief in the lawsuit has

23   been the recovery of the approximately $54 million in Community Fees paid by residents in

24   California and Washington. Under Plaintiffs' case theory, the Community Fees would not have

25   been paid had residents known the "true" facts that resident assessments are not used to set facility

26   staffing. Unlike other charges—such as care fees as to which residents arguably received some

27   value for services rendered—the Community Fees arguably are the least likely to be affected by

28   Defendant's offset and related defenses. Defendant's records indicate the total amount of

15

1   Community Fees paid by Settlement Class Members was approximately $54 million.  As discussed

2   above, Defendant has agreed to pay a settlement fund of $16.25 million, of which roughly $8.395

3   will be available for distribution to class members. Based on the proposed apportionment between

4   the California and Washington Subclasses based on the respective percentage of the amount of

5   total Community Fees paid, that translates to an estimated average Settlement Payment Percentage

6   of approximately 13.9% of the average Community Fees paid by the California Subclass, and

7   approximately 15.3% of the average Community Fees paid by the Washington Subclass.

8        While the Community Fees represent the most solid damage claim at trial, for settlement

9   purposes, there is no guarantee that the trier of fact would award the full amount of these fees. As

10  to these fees, and other payments made by residents (such as rent), Defendant contends Plaintiffs'

11  damage claims are barred (or at least mitigated by the resident's receipt of care services after

12  move-in). In addition to substantive defenses, Defendant argues the claims are not suitable for

13  class treatment, given the arguable resident-specific issues raised.  Even if the Court certified a

14  litigation class, Defendant is expected to raise vigorous trial defenses as to both liability and

15  damages. For example, Defendant argues there is no omission or misrepresentation concerning

16  staffing levels or the use of assessments in setting or reviewing staffing levels at their assisted

17  living facilities. Defendant contends resident assessments are considered in setting or reviewing

18  staffing at its facilities, that their residency agreement does not promise that facility staffing levels

19  will be based on any particular factor including resident assessments, and that prospective

20  residents based their decision to enter their facilities on non-staffing factors. (Stebner Decl., ¶46.)

21       While Plaintiffs disagree with Defendant's arguments and other anticipated defense

22  arguments, for settlement evaluation purposes, these and other defense arguments, asserted by

23  skilled and experienced counsel, raise real trial risks and must be considered. In any event, the fact

24  that the projected per-resident settlement award is less than the potential trial recovery does not

25  preclude settlement approval.  Quite the contrary, it is "well-settled law that a cash settlement

26  amounting to only a fraction of the potential recovery does not per se render the settlement

27  inadequate or unfair." (*In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000)

28

1   (quoting *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 628 (9th Cir. 1982).)  A proposed

2   settlement is not to be measured against a hypothetical ideal result that might have been achieved.

3   (*See, e.g., Linney v. Cellular Alaska Partnership*, 151 F.3d 1234, 1242 (9th Cir. 1998).)  That is

4   because the "very uncertainty of outcome in litigation" and avoidance of expensive litigation

5   "induce consensual settlements." (*Id*.)

6        Here, the projected average settlement payment of approximately $950 for the California

7   Subclass and $1,550 for the Washington Subclass (which respectively represent roughly 13.9% and

8   15.3% of the hard damages most likely to recovered at trial per class member) is well within the

9   range of reasonableness for Court approval.  (*See, e.g., In re Omnivision Techs*., 559 F. Supp. 2d

10  1036, 1042 (N.D. Cal. 2007) (approving settlement where class received payments totaling 6% of

11  potential damages); *In Re Armored Car Antitrust Litig*., 472 F. Supp. 1357, 1373 (N.D. 1979)

12  (collecting cases in which settlements with a value of 1% to 8% of the estimate total damages were

13  approved); *Trombley v. Nat'l City Bank*, 759 F. Supp .2d 20, 25-26 (D.D.C. 2011) (settlement in

14  range of 17-24% of potential recovery at trial was within range of possible approval);  *Winans et al.*

15  *v. Emeritus et al.*, 2016 U.S. Dist. LEXIS 3212 (N.D. Cal. 2016) at \*\*13-15 (approving class

16  settlement that provided roughly 20-40% of the estimated "hard damages" at trial); *Carnes v. Atria*

17  *Senior Living*, No. 3:14-cv-02727-VC (N.D. Cal. 2016) (approving class settlement that provided

18  approximately 32% of the estimated damages at trial).)  It also falls within the range of Class

19  Counsel's previously approved class settlements involving similar clients, claims, and/or issues.

20  (Stebner Decl., ▯47; *see* N.D. Cal. Proc. Guid., Rule 11.) Further, the actual settlement awards will

21  likely exceed the projected averages. To be sure, the Settlement Administrator is tasked with

22  making all reasonable efforts to locate and pay all Settlement Class Members (or their legal

23  successors). Still, the practical reality is that some Class Members will not be located or not have

24  successors. As such, some funds will go undistributed.  If so, under the Agreement, the

25  Administrator will use those funds to increase the payment amounts for the Class Members who

26  have been located.  (See SS ¶ 7.9.)

27        In addition to cash payments, the settlement provides important non-monetary relief.  As

28

discussed above, the Stipulated Injunction requires Aegis to provide staffing levels sufficient to provide current residents with the care services set forth in their service plans at their California and Washington assisted living facilities, which addresses the crux of this case.  (Stipulated Injunction, ¶¶ 1-10.) The non-monetary term further supports the reasonableness of the overall settlement.  See *Linney v. Cellular Alaska Partnership* (N.D. Cal. July 18, 1997) 1997 WL 450064, at **6-7 (court considers injunctive relief in evaluating fairness of settlement and fee request).

### 2.      The Litigation Risks Support Preliminary Approval

The potential risks attending further litigation support preliminary approval.  Plaintiffs face significant challenges with respect to class certification. Among other arguments, Defendant contends that Plaintiffs' claims necessarily require consideration of the care services provided (or not) to each resident.  According to Defendant, that will trigger individual issues and thus negate class certification, under cases such as *Walmart* and *Comcast*. Defendant also contends that written arbitration agreements between Defendant and up to approximately 90% of the class member residents preclude a litigation class in this case. (Stebner Decl., ¶49.) While Plaintiffs believe the claims asserted are proper for class treatment, Defendant's anticipated challenge to class certification is a litigation risk that bears on the overall settlement evaluation. Even if the Court certified a litigation class, Defendant is expected to raise vigorous trial defenses as to both liability and damages. For example, Defendant has asserted that residents received value (in the form of care services and other benefits) that negate (or at least mitigate) any recovery. Defendant also argues that there is no misrepresentation or omission concerning staffing or staffing levels at Aegis' communities, or the use of assessments in setting or reviewing staffing or staffing levels. Defendant contends that resident assessments are considered in setting or reviewing staffing at its communities, and that prospective residents based their decision to enter Aegis' facilities on non-staffing factors. Again, Plaintiffs disagree with Defendant's arguments and other anticipated defense arguments.  But Defendant's contentions, asserted by extremely skilled and experienced counsel, raise real trial risks.  Further, proceeding to trial (and the inevitable appeal) could add several years to the resolution of this case.  Given the elderly status of most class members, the

potential for years of delayed recovery is a significant concern.  Considered against the risks of continued litigation, and the advanced age of many of the plaintiff class members, the totality of relief provided under the proposed Settlement is more than adequate and well within the range of reasonableness. (See Stebner Decl., ¶¶49-50.)

Furthermore, the impact of the COVID-19 pandemic cannot be overstated.  Under the extraordinary and uncertain circumstances when the parties reached a putative settlement in July 2020, the West Coast had just come off the initial surge in infections with no prospect of a vaccine.  Indeed, the first major COVID-19 hotspot was at a long term care center in a suburb of Seattle, Washington.  The COVID-19 infection rate was soaring in long term care facilities, posing a significant threat to the health and safety of class member residents.  For example, studies have found that although less than one percent of the American population lives in long term care facilities, they have accounted for approximately 36% of US COVID-19 deaths.  The pandemic also posed a real and long term threat to the financial viability of businesses including Aegis.  In addition to contemplating Defendant's bleak financial picture, there were a slew of bills and executive appeals seeking broad legal immunity including for the long term care industry. Moreover, as the Court is well aware, the myriad uncertainties arising from the pandemic also included months-long delays in civil cases, the cessation of jury trials, and the possibility of courts closing their doors completely in response to the pandemic. (See Stebner Decl., ¶50.)

**C.      The Proposed Attorneys' Fees, Litigation Expenses and Service Awards Are Within The Range of Reasonableness**

At this stage, the Court is not asked to rule on the anticipated requests for attorneys' fees, reimbursement of litigation costs and service awards to the named plaintiffs.  However, the record shows the amounts proposed in the Agreement on these items fall within an acceptable range.

Under the Agreement, the request for reimbursement of litigation expenses will not exceed $1.3 million, and Plaintiffs' attorneys' fees subject to Court approval will not exceed $6.35 million.  The anticipated fee request will represent a "negative" multiplier of approximately 0.59

1    on lodestar fees to date.[8]  Given that additional attorney time will be required for settlement

2    approval and implementation phases, the projected negative multiplier will be even lower.

3    (Stebner Decl., ¶51.)

4         An award of the maximum attorneys' fees permitted under the Settlement Stipulation

5    ($6.35 million) would represent approximately 39% of the Settlement Fund. That is within the

6    range approved in comparable consumer class actions.  *See, e.g., Knight v. Red Door Salons, Inc.*,

7    No. 08-01520 SC, 2009 WL 248367, at *5 (N.D. Cal. Feb. 2, 2009) (approving attorneys' fees

8    award equal to 30% of the settlement fund); *Singer v. Becton Dickinson and Company,* 2010 WL

9    2196104 at *8 (S.D. Cal. June 1, 2010) (awarding 33 1/3% fee in class action); *Ingalls v.*

10   *Hallmark Mktg. Corp.*, Case No. 08cv4342, Doc. No. 77 (C.D. Cal. Oct. 16, 2009) (awarding

11   33.33% fee). *Cicero v. DirectV, Inc.*, 2010 WL 2991486, at *7 (C.D. Cal. July 27, 2010) (case

12   survey of class action settlements "50% [of settlement fund] is the upper limit, with 30-50%

13   commonly awarded in cases in which the common fund is relatively small.").

14        Moreover, California federal trial courts consider the reasonableness of a fee award by

15   reviewing its percentage of the total value of the benefits (e.g., including the value of injunctive

16   relief) conferred on the class. (*Serrano v. Priest (Serrano III)*, 20 Cal.3d  25, 34 (1977); *Boeing*

17   *Co. v. Van Gemert*, 444 U.S. 472, 478-81 (1980); *Lealao v. Beneficial California, Inc.*, 82 Cal.

18   App. 4th 19, 49-50 (2000); *Graciano v. Robinson Ford Sales, Inc.*, 144 Cal.App.4th 140, 164

19   (2006); 3 *Newberg on Class Actions*, § 14.7.)  As this Court held in approving a class settlement in

20   an analogous setting, "[t]he parties also negotiated substantial injunctive relief, and when the

21   Court considers the value of that injunction, it reduces the overall percentage of fees that counsel

22   will receive."  (*Walsh v. Kindred Healthcare, et al.*, 2013 U.S. Dist. LEXIS 176319, *9, *12.)

23   Stating the obvious, this Court will determine what amount of attorneys' fees and costs should be

24   awarded based on the record presented with Plaintiffs' application.  Monies not awarded in fees or

25   costs will be added to the Net Settlement Fund used to make settlement payments. (*See* SS, ¶¶ 7.2

---

26

27   [8] As of March 1, 2021, Plaintiffs' counsel worked approximately 16,350 hours on the California
     and Washington cases combined, with a lodestar of roughly $10.7 million and litigation costs

28   incurred of roughly $1.3 million. (Stebner Decl., ¶51); *see* N.D. Cal. Proc. Guid., Rule 6.)

1    and 7.3.)

2          In addition, the Settlement Stipulation provides for service awards of $15,000 to each

3    Named Plaintiff (totaling $75,000), subject to Court approval.  (SS,¶ 9.3.) That amount is within

4    the range approved by trial courts in this Circuit.  (*See, e.g., Singer v. Becton Dickinson & Co.*,

5    2009 WL 4809646, at *6 (S.D. Cal. Dec. 9, 2009) (approving $25,000 service award); *Garner v.

6    State Farm Mut. Auto. Ins. Co.*, 2010 WL 1687832, at *17 (N.D. Cal. Apr. 22, 2010) (approving

7    $20,000 service award); *Razilov v. Nationwide Mut. Ins. Co*., 2006 WL 3312024 (D. Or. Nov. 13,

8    2006) (approving $10,000 service awards).)  That amount is also within the range approved by this

9    Court. (*See, e.g., Bickley v. Schneider Nat'l Carriers, Inc.* No. 4:08-cv-05806-JSW (N.D. Cal.

10   2016), 2016 U.S. Dist. LEXIS 167144 *9-10 (approving $15,000 service awards); *Ozga v. U.S.

11   Remodelers, Inc.*, No. C09-05112-JSW (N.D. Cal. 2010), 2010 U.S. Dist. LEXIS 91196 *8

12   (approving $10,000 service awards); *see* N.D. Cal. Proc. Guid., Rule 7.)

13   **V.     PRELIMINARY CERTIFICATION OF THE SETTLEMENT CLASS IS
14           WARRANTED**

15         It is well-settled that under FRCP 23(c)(1), courts are authorized to certify a settlement

16   class for purposes of resolving a putative class action. Certification of a settlement class is

17   appropriate where the plaintiff demonstrates numerosity, commonality, typicality and adequacy

18   of representation, and one of the three requirements of FRCP 23(b) is met. *See, e.g., Valentino v.

19   Carter-Wallace, Inc*., 97 F.3d 1227, 1234 (9th Cir. 1996). The Court need not consider the

20   manageability of a litigation class because the settlement, if approved, would obviate the need for

21   a trial.  *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997); *Hanlon*, 150 F.3d at

22   1021-23. The proposed Settlement Class meets the requirements for provisional certification.

23   Defendant disputes this case can meet the requirements for class certification absent its agreement

24   for settlement purposes only.

25         **Numerosity/Ascertainability**.  In compliance with Rule 23(a)(1), the members of the

26   Settlement Class are so numerous that joinder of all members is impractical. *Fry*, 198 F.R.D. at

27   467.  The Settlement Class consists of approximately 10,069 current and former residents of

28   Aegis' facilities in California and Washington. Under the Settlement Stipulation, Defendant will

provide the Settlement Administrator with a list of the last known contact information for all Settlement Class Members. (SS, 1.36; Stebner Decl., ￼52.)

**Common Issues**.  The requirements of Rule 23(a)(2) are met, as the lawsuit involves several common class-wide issues that, absent the settlement, would drive the resolution of the claims.  *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct.  2541, 2551 (2011).  Disputed issues common to the named plaintiffs and the Class include (a) whether Defendant violated the Consumer Legal Remedies Act, Washington Consumer Protection Act, and other statutes and regulations by misrepresenting and/or failing to disclose the manner in which resident assessments would be used to determine facility staffing; (b) whether a "reasonable consumer" would have been misled by Defendant's misrepresentations, misleading statements and omissions; and (c) whether the Named Plaintiffs and class members were "damaged" and entitled to monetary recovery.  (TAC, ¶ 117.)

**Typicality**.  The claims of the Named Plaintiffs are typical of the claims of the Settlement Class, as required under Rule 23(a)(3).  As alleged in the Third Amended Complaint, Defendant misrepresented to Plaintiffs and the class members and/or their family members that Defendant uses its resident assessment system to determine the care services to be provided by facility staff and to assess and bill residents for corresponding care points.  Rather, Defendant allegedly has a policy of fixed staffing, regardless of the results generated by its resident assessment system, which results in residents not receiving all of the care they have paid for and/or being subjected to the inherent risk that, on any given day, facility staffing will be insufficient to provide the promised care for all residents.  Further, as alleged in the Third Amended Complaint, Defendant has failed to disclose and concealed this material fact from the Named Plaintiffs and the class. Plaintiffs' claims are typical of the claims of the proposed class in the following ways: 1) Plaintiffs are members of the proposed class; 2) Plaintiffs' claims arise from the same uniform corporate policies, procedures, practices and course of conduct on the part of Defendant; 3) Plaintiffs' claims are based on the same legal and remedial theories as those of the proposed class and involve similar factual circumstances; 4) the injuries suffered by the Named Plaintiffs are

similar to the injuries suffered by the proposed class members; and 5) Plaintiffs seek a common form of relief for themselves and the members of the class.  (TAC, ¶ 118.)  Based on these and other allegations, the typicality requirement is clearly met.  *Hanlon*, 150 F.3d at 1020 (typicality established if claims of representative plaintiff are "reasonably coextensive with those of absent class members; they need not be substantially identical.")

**Adequate Representation**. Plaintiffs must show (1) the "ability and the incentive" to represent the class vigorously; (2) that they have "obtained adequate counsel", and (3) that there is "no conflict between the individual's claims and those asserted on behalf of the class." *Fry*, 198 F.R.D. at 469 (internal citations omitted); *see also Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978).  These requirements are met. Because the claims asserted by Named Plaintiffs are typical of those asserted on behalf of the Class, the Named Plaintiffs have the same interests in the outcome of this case.  (*See also* TAC, ¶ 119.) As evidenced by the discovery and other efforts to date, Plaintiffs have shown the incentive and ability to carry out their responsibilities as class representatives.  Further, the case is being prosecuted by counsel well-versed in class actions generally and elder abuse matters in particular.  (Stebner Decl., ¶56.)

**Predominance/Superiority.**  Under Rule 23(b)(3), class certification is appropriate if "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  As explained above, the common issues triggered by the Named Plaintiffs' claims predominate over any individual questions, as resolution of issues such as whether a reasonable person would construe the Aegis contract as a promise to staff to meet assessed resident needs, and whether Aegis in fact disregarded its own resident assessments in setting facility staffing, will necessarily resolve the liability determination.  (*See also* TAC, ¶¶ 120-122.) Litigating these common issues on a class basis is clearly superior to multiple individual and duplicative proceedings on these same questions, particularly given the frail and elderly status of most Class Members.

**VI.     THE FORM AND MANNER OF CLASS NOTICE SHOULD BE APPROVED**

The form and manner of the Class Notice proposed here complies with Rule 23 and the overall requirements of due process.  The form of a class action settlement notice "is satisfactory if it 'generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.'" *Churchill Village LLC v. General Electric*, 361 F.3d 566, 575 (9th Cir. 2004) (quoting *Mendoza v. U.S.*, 623 F.2d 1338, 1352 (9th Cir. 1980)).   The proposed Notice here provides sufficient detail in plain language to allow Settlement Class Members to make an intelligent decision with respect to their legal rights under the settlement. In clear and straightforward language, the Notice describes the claims asserted, the settlement terms, the monetary and other relief provided, and the amounts proposed for settlement administration, attorneys' fees and litigation costs, and service awards for the Named Plaintiffs.  It explains the procedures for opting out of, or objecting to, the settlement, along with the consequences of pursuing these options or remaining in the settlement. (Class Notice, NOL Ex. C; Stebner Decl., ¶58.)  Further, the manner of class notice proposed here satisfies the "best notice practicable" requirement under Rule 23(c)(2)(B).  The Settlement Stipulation provides dissemination of class notice to Settlement Class Members by first class U.S. Mail and e-mail. To effectuate notice, Defendant will provide names and contact information for all Settlement Class Members (and representatives/family members to the extent available) to the Administrator, which will be updated through standard change of address and other procedures. Any returned mail shall be re-sent after a skip trace is performed. In addition to mailing and e-mailing, a summary form of the Court-approved class notice will be published in the California and Washington editions of *USA Today* and posted on the settlement website. The settlement administration expenses, which the Settlement Administrator estimates will not to exceed $105,000, will be paid from the Settlement Fund. (SS, ¶¶ 1.36, 3.1, 3.2, 4.1, and 4.2; Stebner Decl., ¶¶ 39, 58.)

**VII.    CONCLUSION**

For the reasons set forth herein, Plaintiffs respectfully request that the Court grant preliminary approval for the Settlement Stipulation in this case, grant provisional certification of

the Settlement Class, and appoint Plaintiffs' Counsel to act as Class Counsel. A proposed form of order is submitted with this motion.

DATED: March 23, 2021

Respectfully submitted,

STEBNER AND ASSOCIATES

_____/s/ Kathryn A. Stebner_____
Kathryn Stebner
Attorneys for Plaintiffs and Proposed Class