Kathryn A. Stebner, State Bar No. 121088
**STEBNER AND ASSOCIATES**
870 Market Street, Suite 1212
San Francisco, CA  94102
Tel:  (415) 362-9800
Fax:  (415) 362-9801

Guy B. Wallace, State Bar No. 176151
**SCHNEIDER WALLACE COTTRELL KONECKY LLP**
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Tel:    (415) 421-7100
Fax:    (415) 421-7105

[Additional counsel listed on service list]

Attorneys for Plaintiff and the Proposed Class

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA - OAKLAND

| | |
|---|---|
| June Newirth, by and through her Guardian ad Litem, Frederick J. Newirth; Barbara Feinberg; and Elizabeth Barber, Andrew Bardin, and Thomas Bardin as successors-in-interest to the Estate of Margaret Pierce; on their own behalves and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>Aegis Senior Communities, LLC, dba Aegis Living; and Does 1 Through 100,<br><br>Defendants. | CASE NO.  **4:16-cv-03991-JSW**<br><br>**CLASS ACTION**<br><br>**DECLARATION OF KATHRYN STEBNER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT**<br><br>Date:   May 7, 2021<br>Time:   9:00 a.m.<br>Place:  Courtroom 5, 2nd Floor<br>Judge: Hon. Jeffrey S. White<br><br>Action Filed: April 12, 2016<br>Trial Date: None Set |

1

I, Kathryn Stebner, hereby declare,

1.      I am an attorney duly licensed to practice before all the courts of the State of California and am a member in good standing of the State Bar of California.  I am the principal of Stebner and Associates and am counsel for the Plaintiffs in the above captioned matter (the "Action").  I am submitting this Declaration in support of Plaintiffs' Motion for Preliminary Approval of Class Settlement.  Unless otherwise indicated, I have personal knowledge of the facts set forth herein.  If called upon to testify, I would do so competently.

2.      Attached as Exhibit A to Plaintiffs' Notice of Lodgment ("NOL") is a true and correct copy of the Stipulation of Settlement ("Settlement Stipulation") and Amendment to the Stipulation of Settlement agreed to by the parties in this case. Attached as exhibits to the Settlement Stipulation are the parties' Stipulated Injunction, proposed Class Notice (long form and summary form), a proposed Preliminary Approval Order, and an Escrow Agreement and Escrow Procedure Agreement.

**Plaintiffs' Counsel Experience and Background**

3.      Plaintiffs' Counsel have substantial experience in class action litigation and, in particular, consumer class action cases involving assisted living facilities and skilled nursing facilities.

4.      I have been practicing law since 1985, prosecuting elder abuse cases since 1987, and practicing solely in the elder abuse area for nearly twenty years.  I have been actively involved with California's leading elder advocacy group, California Advocates for Nursing Home Reform ("CANHR"), since 1987, and have sat on the California Bar-sanctioned lawyer referral panel of CANHR for Elder and Dependent Abuse Civil Protection Act (EADACPA) cases since 2002.  I have tried more than twenty trials and arbitrations.  Among other publications, I am the author of two chapters in the CEB treatise on elder abuse, including financial elder abuse.  I am a Past-President of the San Francisco Trial Lawyers' Association (SFTLA), have been on the Board of Governors of the Consumer Attorneys of California (CAOC) for over ten years and am currently a Vice President.  I have lectured on numerous occasions regarding elder abuse cases, including

several lectures on class action law and the use of Business & Professions Code section 17200 and the CLRA in Elder Abuse actions.  I have also testified on several occasions before the California Assembly and Senate on bills pertaining to elder abuse and elder rights. Along with others in the Plaintiffs' Counsel group, I have been approved by California state and federal courts to serve as Class Counsel in numerous other consumer class actions against assisted living facilities and skilled nursing facilities.

5.      Christopher J. Healey, a partner at Dentons US LLP, was admitted to the State Bar of California in 1982.  From 1982 through 1984, he served as a law clerk to the Honorable William B. Enright, United States District Court Judge for the Southern District of California (now retired). He has tried more than ten cases to verdict before a jury or judge. His primary area of expertise is class action litigation and for most of his nearly forty years of law practice, he has defended clients sued in consumer and business class actions. Commencing in approximately 2006 with the *Skilled Healthcare* litigation (described below), however, he joined with other Plaintiffs' Counsel to prosecute class actions filed to address understaffing and related issues in longterm care facilities.  Along with others in the Plaintiffs' Counsel group, he has been approved by California state and federal courts to serve as Class Counsel in numerous other consumer class actions against skilled nursing facilities and assisted living facilities.

6.      Guy B. Wallace, a named partner with Schneider Wallace Cottrell Konecky LLP, was admitted to the State Bar of California in 1995.  He has extensive experience in class actions and specializes in disability civil rights and in employment class actions.  He has served as lead counsel, co-lead counsel, or class counsel in more than twenty litigated class actions, including cases through trial and on appeal. Mr. Wallace serves as a board member for the San Francisco Trial Lawyers Association, the San Francisco Bar Association, Disability Rights California, and the ACLU-Northern California.  He is a recognized expert in the area of civil rights litigation.

7.      Plaintiffs' Counsel also include Michael Thamer of the Law Offices of Michael Thamer and William Tim Needham of Janssen Malloy LLP.  Mr. Thamer has practiced law since 1981, has tried more than fifty jury trials to verdict and has prosecuted hundreds of elder and

dependent abuse cases in California.  Mr. Needham has practiced law since 1980, is an ABOTA member and has tried more than fifty jury trials to verdict in addition to numerous court trials and arbitrations.  Mr. Healey, Mr. Thamer, and Mr. Needham jointly received a California Lawyer of the Year (CLAY) award in 2010 for work on the *Skilled Healthcare* case, a class action that was tried to verdict after a six-month jury trial.  They were also named Consumer Attorneys of the Year (2010) by Public Justice and CAOC for work on the *Skilled Healthcare* trial.

8.      Plaintiffs' Counsel also include David Marks of the Law Firm of Marks Balette Giessel & Young, PLLC.  Mr. Marks has practiced law for over thirty years and was admitted *pro hac vice* to appear as co-counsel for Plaintiffs in this matter. Mr. Marks has served as trial counsel in some of the largest verdicts in the United States arising out of the wrongful death or catastrophic injury of a skilled nursing facility resident.  He has also served as invited faculty for the American Academy of Forensic Science; the United States Department of Justice; the Association of Trial Lawyers of America; the Southern Trial Lawyers of America; the American Association for Justice; the National College of District Attorneys; the University of Arkansas School of Medicine; the University of Texas School of Nursing; Texas Tech School of Nursing; State Bar of Texas, the National Association of Medicaid Fraud Examiners; and various state trial lawyers' associations. Mr. Marks has been involved in legislative efforts to correct inadequate enforcement of skilled nursing facility regulations for more than twenty years. He has testified as an expert witness before the U.S. Senate Committee on Aging and the Health and Human Resource Committee, Texas House of Representatives. Further, he has also served on the Sub-Committee on Nursing Home Regulation and Enforcement; Institute of Medicine, and the National Academy of Science. In 2005, the National Citizens Coalition for Nursing Home Reform (NCCNHR) awarded Mr. Marks with its Special Appreciation Award for his effective promotion of residents' rights and in supporting NCCNHR's national advocacy in improving accountability and quality in skilled nursing facilities.

9.      Plaintiffs' Counsel also include Dan Drachler of the Law Firm of Zwerling Schachter & Zwerling LLP.  Mr. Drachler will file an appearance as co-counsel for Plaintiffs in

this matter in conjunction with the Stipulated Motion to Amend the Scheduling Order, For Leave to File Third Amended Complaint, and for Permissive Joinder ("Motion to File TAC"). Mr. Drachler has been co-counsel for Plaintiffs in *Morrison v. Aegis Senior Communities, LLC,* Case No. 18-2-06326-4 SEA (the "Washington Action") since the inception of the case. Mr. Drachler concentrates in the areas of antitrust, consumer and securities class action litigation. He chairs his firm's antitrust practice group and has over 30 years' experience representing the interests of consumers, businesses, union pension and health and welfare funds, and state, local and tribal governments. Mr. Drachler served as co-lead counsel in *In re Cipro Cases I & II*, an antitrust class action lawsuit challenging pharmaceutical reverse payment agreements. The case led to a landmark decision by the California Supreme Court and the creation of a new structured rule of reason standard. The case resulted in settlements totaling $399 million. He was also one of the lead counsel in *Rodriguez v. West Publishing Corp.*, an antitrust class action alleging the fixing of prices for BARBRI bar review courses. The case settled for $49 million. Mr. Drachler currently serves in leadership positions in a number of antitrust and RICO cases, including *Lincoln Adventures, LLC v. Those Certain Underwriters at Lloyd's London*, challenging a conspiracy among insurance syndicates at Lloyd's of London that resulted in U.S. insureds having to pay higher prices for insurance products sold in the United States; *In re Restasis Antitrust Litigation*, challenging the anticompetitive conduct of Allergan, Inc. that resulted in consumers and third-party payors paying more than they should have for the dry eye medication Restasis. Mr. Drachler also serves as counsel to tribes in California, Washington and Alaska in *In re National Prescription Opiate Litigation*, seeking to redress the scheme of pharmaceutical manufacturers, distributors and pharmacies that resulted in the nationwide opioid crisis. Prior to joining Zwerling Schachter & Zwerling LLP, Mr. Drachler served as Chief Deputy Attorney General for the State of New York where he supervised and coordinated all legal matters in the Department of Law. He has also served as an adjunct professor of law and has lectured on antitrust issues as well as issues involving the intersection of government and private counsel in class action litigation.

        10.      Plaintiffs' Counsel also include Leah S. Snyder, founder of the Law Firm of Ember

Law PLLC.  Ms. Snyder will file an appearance as co-counsel for Plaintiffs in this matter in conjunction with the Motion to File TAC.  Ms. Snyder has been co-counsel for Plaintiffs in the Washington Action since the inception of the case.  She has been practicing litigation in Seattle, Washington, since 2011.  Her current practice focuses on all aspects of civil litigation.

11.     Plaintiffs' Counsel also include Kirsten Fish of the Law Firm of Needham Kepner & Fish LLP.  She has been practicing law since 2001 and has been a partner at her firm since 2007.  Ms. Fish focuses her practice on personal injury, wrongful death and elder abuse litigation. She is the author of "Litigating Financial Abuse Actions Against Institutions, Agents and Fiduciaries" in CEB's *California Elder Law Litigation: An Advocate's Guide*. She is also a frequent guest lecturer, presenting annual seminars in Northern California such as CEB's "Civil Litigation Practice: Recent Developments" since 2010 and "What's New in Tort & Trial" since 2010.  Ms. Fish has also lectured to law students studying Trial Techniques at Santa Clara University School of Law and has taught both Legal Research and Writing and Torts to first year law students at Lincoln Law School in San Jose.

12.     Along with several co-counsel in this case, I have experience representing plaintiffs in five other California class action cases against owners of assisted living facilities alleging violations of the CLRA, fraudulent business practices (pursuant to Business & Professions Code section 17200), and elder financial abuse, as well as a class action against owners of assisted living facilities in Washington State.  Three of the other California class actions against assisted living facility operators have settled: *Winans v. Emeritus Corporation* (N.D. Cal., Case No. 3:13-cv-03962-HSG) was settled in 2015, and had been pending in the U.S. District Court, Northern District of California; *Carnes v. Atria Senior Living, Inc.* (N.D. Cal., Case No. 3:14-cv-02727-VC) was settled in 2016, and had been pending in the U.S. District Court, Northern District of California; and *Lollock, et al. v. Oakmont Senior Living, LLC, et al.* (Superior Court of California, County of Alameda, Case No. RG17875110) was settled in 2020, and had been pending in the Superior Court of California, County of Alameda.

13.     Along with several co-counsel in this case, I have also represented the plaintiffs in

class actions filed against skilled nursing facility chains alleging system-wide violations of minimum nurse staffing requirements in California.  One of these actions, *Wehlage v. EmpRes Healthcare, Inc., et al.*, Case No. 10-05839 CW, was settled in 2013, and had been pending in the Northern District of California.  Another action, *Walsh v. Kindred Healthcare, et al.*, Case No. 11-00050-JSW, was settled in 2013, and had been pending in the Northern District of California.  Six other cases, *Valentine v. Thekkek Health Services, Inc.*, No. RG-10546266 in Alameda County Superior Court in front of the Hon. Robert Freedman; *Montreuil v. The Ensign Group, Inc.*, No. BC449162 in Los Angeles County Superior Court; *Hernandez v. Golden Gate Equity Holdings, LLC*, No. CGC-10-505288 in San Francisco County Superior Court; *Shuts v. Covenant Holdco LLC*, No. RG 10551807 in Alameda County Superior Court in front of the Hon. Wynne Carvill; *Dalao v. LifeHouse Holdings, LLC*, No. RG12660602 in Alameda County Superior Court in front of the Hon. Wynne Carvill; *Correa v. SnF Management Company, LLC*, No. RG-13664498 in Alameda County Superior Court in front of the Hon. Wynne Carvill; *Regina v. Hycare, Inc.* No. RG-12647573 in Alameda County Superior Court originally in front of the Hon. Wynne Carvill and later in front of the Hon. George Hernandez, Jr., have also now settled.

14.    On the appellate level, Plaintiffs' Counsel have been at the forefront on nurse understaffing and related issues in skilled nursing facilities, including several reported decisions in nurse staffing class actions.  *See e.g., Conservatorship of Gregory* (2000) 80 Cal. App. 4th 514; *Fitzhugh v. Granada Healthcare LLC* (2007) 150 Cal. App. 4th 469; *Shuts v. Covenant Holdco LLC* (2012) 208 Cal.App.4th 609; *Walsh v. Kindred Healthcare* (N.D. Cal 2011) 798 F. Supp. 2d 1073; *Wehlage v. EmPres Healthcare , Inc*. (N.D. Cal 2011) 791 F. Supp. 2d 774.

**Case Proceedings**

15.    This case is based on allegations that Defendant misleadingly failed to disclose that resident assessments performed by its personnel would not be used to set facility staffing, but instead that Defendant failed to disclose that staffing is primarily determined by labor budgets and profit objectives. Defendant disputes these allegations in their entirety, denies any legal liability and vigorously defended the case since the initial complaint was filed on April 12, 2016.  The lead

claim for monetary relief in the lawsuit has been the recovery of the approximately $54 million in Community Fees paid by Defendant's residents in California and Washington. Under Plaintiffs' case theory, the Community Fees would not have been paid had residents known the "true" facts that resident assessments are not used to set facility staffing. Unlike other charges—such as care fees as to which residents arguably received some value for services rendered—the Community Fees arguably are the least likely to be affected by Defendant's offset and related defenses.

16.     On April 12, 2016, the California Named Plaintiffs June Newirth, by and through her successor-in-interest, Kathi Troy; and Elizabeth Barber, Andrew Bardin, and Thomas Bardin as successors-in-interest to the Estate of Margaret Pierce, on behalf of themselves and all others similarly situated (together, "California Named Plaintiffs") filed this action against Defendant. Filed as a putative class action, the lawsuit sought relief on behalf the California Named Plaintiffs and all persons who resided in any of Defendant's California assisted living facilities since April 12, 2012.  The California Named Plaintiffs asserted claims for damages and other relief under California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.* ("CLRA"), California's unfair competition statute, Bus. & Prof. Code §§ 17200 et seq. ("UCL") and the Financial Elder Abuse statute, Cal. W&I Code § 15610.30 (collectively, the "California Claims").

17.     On March 8, 2018, the Washington Named Plaintiff Carol M. Morrison by Stacy A. Van Vleck as Attorney-in-Fact on behalf of herself and all others similarly situated ("Washington Named Plaintiff") filed a putative class action complaint against Defendant in the Superior Court of Washington, County of King.  On October 15, 2018, the Washington Named Plaintiff filed a First Amended Complaint captioned *Carol M. Morrison, et al. v. Aegis Senior Communities, LLC, dba Aegis Living*, case no. 18-2-06326-4-SEA ("Washington Action"), for claims arising under Washington's Consumer Protection Act ("CPA", RCW 19.86.020) and Financial Exploitation of Vulnerable Adults Statute (RCW 74.34.020, 74.34.200) (collectively, the "Washington Claims"). The Washington Action sought relief on behalf the Washington Named Plaintiff and all persons who resided in any of Defendant's Washington assisted living facilities since March 8, 2014.

18.     The crux of Plaintiffs' cases in California and Washington is that Defendant

allegedly misled residents, family members, and the general public to believe that resident

assessments would be used to determine staffing at Aegis' facilities.  Plaintiffs allege that facility

staffing is not determined by resident assessments but instead is based primarily on labor budgets

and pre-determined profit objectives.  Defendant denies the allegations and claims in the case in

their entirety and denies any wrongdoing whatsoever.  Defendant also denies that the case is

appropriate as a class action for purposes of litigation.  Defendant has agreed to settle to avoid

continued burdensome and costly litigation.

19.    The California Action and Washington Action have been vigorously litigated from

inception.  In the California Action, following Plaintiffs' amendment to the initial complaint,

Defendant removed to Federal Court on July 14, 2016.  On July 21, 2016, Defendant filed a

Motion to Compel Arbitration and Dismiss Class Claims and a Motion to Dismiss the First

Amended Class Action Complaint.  On August 24, 2016, the California Named Plaintiffs filed a

Second Amended Complaint.  On September 21, 2016, Defendant filed a Motion to Dismiss the

Second Amended Class Action Complaint.  On May 18, 2017, the District Court denied

Defendant's Motion to Dismiss the Second Amended Class Action Complaint.  On July 28, 2017,

Defendant renewed its Motion to Compel Arbitration and Dismiss Class Claims.  On September

29, 2017, the District Court denied Defendant's renewed Motion to Compel Arbitration and

Dismiss Class Claims.  On October 27, 2017, Defendant filed a Notice of Appeal and Motion to

Stay Pending Appeal.  On November 21, 2017, the District Court denied Defendant's Motion to

Stay Pending Appeal.  On July 24, 2019, the United States Court of Appeals for the Ninth Circuit

affirmed the District Court's order denying Defendant's Motion to Compel Arbitration.  On

September 10, 2019, Defendant answered the Second Amended Complaint, wherein Defendant

expressly denied the allegations and claims alleged in the Second Amended Complaint.  On

October 4, 2019, Defendant filed a Motion to Strike Class Definition or to Deny Class

Certification in the alternative.  On October 18, 2019, Defendant filed a Motion for Summary

Judgment.  On October 21, 2019, the California Named Plaintiffs filed a Motion for Class

Certification.  The District Court subsequently granted the stipulated requests by the California

Named Plaintiffs and Defendant (together, "California Parties") to continue the hearings on the Motion for Class Certification and Motion for Summary Judgment.  When the California Parties notified the District Court about this settlement on July 23, 2020, the District Court denied, without prejudice, the Motion for Class Certification, Motion for Summary Judgment, Motion to Strike the Class Definition or Deny Class Certification, subject to renewal if this settlement is not consummated.

20.     In the Washington Action, following Plaintiff's amendment to the initial complaint, Defendant filed a Motion to Deny Class Certification on October 17, 2019.  By order dated May 1, 2020, the Washington state court (Hon. Marshall Ferguson) denied Defendant's motion.  On October 25, 2019, Defendant answered the First Amended Complaint, wherein Defendant expressly denied the allegations and claims alleged in the First Amended Complaint.

21.     To date, a litigation class is yet to be certified in the California or Washington Actions.

**Investigation and Discovery**

22.     Prior to reaching a settlement, Plaintiffs engaged in substantial investigation and discovery.  In the California Action, those efforts included extensive review of public documents prior to the filing of the lawsuit, written and deposition discovery, including written discovery responses exchanged between the parties, Defendant's production of approximately 132,483 pages of documents, including approximately 621 Excel files, and the depositions of eleven witnesses, including Defendant's executive-level and facility-level personnel, and designated Persons Most Knowledgeable, the Plaintiffs' experts, and two witnesses with knowledge about the claims of the California Named Plaintiffs; as well as data intensive discovery resulting in the production of electronic employee payroll data as well as meet and confer efforts among Defendant and its resident assessment software vendor to obtain Defendant's electronic resident assessment data.

23.     In the Washington Action, those efforts included extensive review of public documents prior to the filing of the lawsuit, extensive written and deposition discovery, including written discovery responses exchanged between the parties, Defendant's production of

approximately 82,063 pages of documents, including 3,667 Excel and native files, and the depositions of three witnesses, including the Class Representative in this action; as well as data intensive discovery resulting on the production of electronic employee payroll data and resident assessment data.

24.     The electronic payroll and assessment data was used by Plaintiffs' staffing experts to undertake a "shortfall" analysis regarding sample facilities in California and Washington.

25.     In addition, Plaintiffs in both actions engaged in extensive meet and confer efforts and motion practice to obtain Defendant's production of documents and responses to interrogatory discovery; participation in discovery hearings before magistrate judges to compel Defendant's production of certain documents.

**Settlement Negotiations**

26.     The global settlement agreement for the Californian and Washington Actions was reached as a result of extensive arm's length negotiations through parties' counsel.  This included a full-day mediation of the California Action on May 29, 2018 before the Honorable Ronald Sabraw (ret.) of JAMS in San Jose, California; a second full-day mediation of the California Action on October 2, 2018 before the Honorable Ronald Sabraw (ret.) of JAMS in San Jose, California; a full-day joint mediation of the California Action and Washington Action on October 22, 2019 before the Honorable Bruce Hilyer (ret.) of Hilyer Dispute Resolution in Seattle, Washington; and a full-day joint mediation of the California Action and Washington Action on March 24, 2020 before the Honorable Rebecca Westerfield (ret.) of JAMS in San Francisco, California.  Although the case did not resolve at the mediation session with Judge Westerfield, the parties continued settlement efforts, which led to this settlement.  The negotiations were contentious and hard-fought, with several instances where it appeared that the parties would not reach agreement.

**Settlement Terms**

The Settlement Fund

27.     Defendant has agreed to pay $16.25 million to resolve all monetary obligations

owed under the settlement.  In addition to the Settlement Awards paid to Settlement Class Members, the Fund will be used to pay notice/administration costs (not to exceed $105,000), service awards of $15,000 to each Named Plaintiff (totaling $75,000), reimbursement of litigation expenses not to exceed $1.3 million, and Plaintiffs' attorneys' fees in the amount approved by the Court but not exceed $6.35 million.  Factoring in an agreed-upon reserve of $25,000 to cover late claims, the estimated amount available to fund payments to class members is roughly $8.395 million.

28.     Significantly, there will be no reversion of any portion of the Settlement Fund to Defendant.  Rather, unused reserve funds as well as uncashed or returned checks will be used to fund a second round of Settlement Awards to identified class members.  Alternatively, if the remaining amounts make a second distribution economically impractical, the balance will be distributed to a *cy pres* recipient, nominated by Plaintiffs' Counsel and approved by the Court. The proposed cy pres recipient is Groceries for Seniors, a non-profit based in San Francisco providing free food to poor, elderly people.  The parties and their counsel do not have any relationship with the proposed cy pres recipient.

Settlement Payments to Class Members

29.     The Agreement provides for cash payments to Settlement Class Members (or if deceased, their legal successors) on a direct distribution basis, with no claim form requirement to obtain payment.  The parties estimate that the Settlement Class consists of approximately 10,069 current and former residents.

30.     The parties have agreed that CPT Group, Inc. shall serve as the Settlement Administrator.  With over thirty years of experience, CPT Group, Inc., has administered thousands of complex class action cases and billions of dollars in settlement funds.  CPT Group, Inc., has extensive knowledge of complex class action settlement notice programs and are known for their quality of work, timeliness, and competitive pricing.  (*See also* CPT Group, Inc.'s website at https://www.cptgroup.com.)  A true and correct copy of CPT Group, Inc.'s proposal to handle class notice and settlement administration on this case is attached as Exhibit B to Plaintiffs' Notice

of Lodgment.  CPT Group, Inc. estimates the Class Notice, settlement administration and related costs will not exceed $105,000.  The parties reviewed proposals from two potential settlement administrators for the same notice and claims administration process and selected CPT Group for their experience and competitive pricing.  Within the last two years, Plaintiffs' counsel engaged CPT Group for the settlement administration of one other class action matter, similarly against an assisted living facility chain in California, in the case *Lollock, et al. v. Oakmont Senior Living, LLC, et al.*, Superior Court of California, County of Alameda, No. RG17875110.

31.     The Settlement Administrator will mail settlement checks to each Settlement Class Member for whom a valid address has been provided by Defendant (or located through the address update procedures).  For Settlement Class Members for whom current addresses cannot be located, the Administrator is authorized to make payment based on a "distribution request" by the class member (or their legal successor or successor-in-interest).  The Settlement Administrator will have a standard procedure in place to ensure that distribution requests and other communications (e.g., opt outs) are made by qualified Settlement Class Members or individuals authorized to act on their behalf.

32.     Subject to Court approval, the cash payments to Settlement Class Members will be calculated by category of Community Fee payment as follows:

     a.  Community Fee Payments of $500 or More

     Settlement Class Members who paid a net Community Fee of $500 or more and Settlement Class Members for whom Community Fee Information is unavailable shall each be entitled to a Settlement Award calculated as follows.  The Settlement Administrator shall first calculate a Settlement Payment Percentage ("SPP") by dividing the Net Settlement Fund (less the amounts allocated for the No Community Fee Paid group per paragraph 3 below) by the total amount of net Community Fees paid by all Settlement Class Members including Settlement Class Members for whom Community Fee Information is unavailable. Next, the SPP shall be applied against the Community Fee paid by or on behalf of each Settlement Class Member and the reduced average net Community Fee assigned to each Settlement Class Member for whom Community Fee Information is unavailable, to derive the Settlement Award amount for each such Settlement Class Member. (*See* SS, ¶¶7.2 and Amendment to SS, ¶ 7.6.)

     Defendant's data showed a total of $53,187,315.75 in Community Fees were paid by or on

behalf of Settlement Class Members after November 1, 2010 ($25,262,684.77 or 47.5 % in California and $27,924,630.93 or 52.5% in Washington).  6,230 Settlement Class Members (3,585 in California and 2,645 in Washington) paid a Community Fee of $500 or more after November 1, 2010.  Additionally, roughly $2,816,921.57 in Community Fees in California and roughly $430,299.94 in Washington were paid by Settlement Class Members prior to November 1, 2010 as calculated pursuant to Paragraph 2 below. The Net Settlement Fund (less the amounts allocated for the No Community Fee Paid group per paragraph 3 below) is $8,236,500 ($3,912,571 in California and $4,323,929 in Washington). Accordingly, under the SPP is estimated to be approximately 13.9% for the California Subclass and 15.3% for the Washington Subclass.  To further illustrate, if a Settlement Class Member in the Washington Subclass paid a Community Fee of $10,000 after November 1, 2010, their estimated settlement payment is $1,525. The projected average settlement payment for the California Subclass is approximately $950, and $1,550 for the Washington Subclass.

     b.  Community Fee Payment of $0 to $499

> Settlement Class Members who paid $0 to $499 in net Community Fees shall each be entitled to a Settlement Award in amount of $50.  (*See* SS, ¶¶7.2 and Amendment to SS, ¶7.6.)

Per Defendant's data, 3,161 residents in the Settlement Class (1,493 in California and 1,668 in Washington) did not pay any Community Fees. An additional 9 Settlement Class Members (4 in California and 5 in Washington) paid less than $499.

     c.  Community Fee Payments Made Pre-November 2010

> Settlement Class Members who paid Community Fees before November 2010 (and thus specific payment amounts are unavailable) shall each be entitled to a Settlement Award calculated as follows.  The Settlement Administrator shall calculate the average Community Fee paid by Settlement Class Members in 2011.  The Settlement Administrator shall divide the number of Settlement Class Members who paid no Community Fee by the number of Settlement Class Members for whom Community Fee Information is available, resulting in a percentage.  The Settlement Administrator shall reduce the average Community Fee paid in 2011 by that percentage.  The reduced average Community Fee amount shall be treated as the net Community Fee amount paid by each Settlement Class Member for whom Community Fee Information is unavailable for purposes of the calculation in paragraph 1 above. (*See* SS, ¶¶7.2 and Amendment to SS, ¶7.6.)

14

Defendant's data showed 678 Settlement Class Members in this group (537 in California and 141 in Washington). The average Community Fee paid in 2011 was $7,430.26 in California and $4,976.29 in Washington. Per Paragraph 3 above, the reduced average Community Fee paid by this group was $5,245.66 in California (totaling approximately $2,816,921.57) and $3,051.77 in Washington (totaling approximately $430,299.94).

33.     Before the distribution, the Administrator will recalculate the per-resident payment using the actual number of class members located through Defendant's records, address updates and Distribution Requests. From past experience with these types of settlements, that process will likely result in an increase in the per-resident payment. The checks will be mailed within thirty calendar days after the Effective Date as defined in the Settlement Stipulation. Settlement Award checks not cashed within the 120-day check cashing deadline (after reasonable reminders issued by the Administrator) shall be added to the Reserve Fund.

34.     The Agreement authorizes the Administrator to hold a reserve of $25,000 to pay late-submitted distribution requests or address other valid requests from Settlement Class Members. Also, Settlement Award checks not cashed within the check cashing deadline (after reasonable reminders issued by the Settlement Administrator) shall be added to the reserve fund. As stated, the Agreement provides for a second potential distribution to identified Settlement Class Members after the initial distribution and late claims process has been completed, assuming funds are left over in an amount sufficient to make another distribution economically practical.

35.     As noted in the Settlement Stipulation and pursuant to Court Approval, the Escrow Agent will safeguard, control, and maintain the Settlement Fund until the Effective Date.  For privacy reasons, the names of Aegis' insurers and all of the authorized agents and certain security measures have been redacted from the corresponding Escrow Agreement and Escrow Procedure Agreement, attached as Exhibit 4 to the Settlement Stipulation.

Stipulated Injunction

36.     The Stipulation of Settlement also includes substantial non-monetary relief in the form of the Stipulated Injunction, which subject to Court approval, will commence on the

Effective Date and remain in place for three years from that date.  The terms of the Injunction address the alleged failures to provide sufficient staffing at Defendant's facilities and the crux of this case.  Among other terms, the Injunction has the following Disclosure Requirements and Staffing Requirements pertaining to any assisted living facility owned or operated by Aegis in California and Washington.

<u>Disclosure Requirements Under the Stipulated Injunction</u>

a.  Aegis personnel shall refrain from making any oral or written statements to current or prospective residents (and if applicable, family members or representatives of current or prospective residents) that state or imply that resident assessments are the only factor used to determine, set or monitor staffing levels at Aegis communities.

b.  Aegis shall ensure that all new Residence and Care Agreements at its communities provided to, made available or entered into after the Effective Date (as defined in the Settlement Stipulation) contain disclosures substantially in the form as follows: (a) the resident assessments described in the Residence and Care Agreement, including those conducted at the time of admission and thereafter during a resident's stay, are considered by Aegis in determining, setting and monitoring staffing levels at its communities. Aegis considers the assessments and other factors to determine, set or monitor staffing levels at Aegis communities; and (b) Aegis does not guarantee that any resident will receive a specific number of minutes or amount of care on any given day or time period.

c.  Aegis shall ensure that its web pages, marketing brochures or other materials, and any other written statements provided to or made available to the consuming public in California and Washington after the Effective Date and that discuss resident assessments contain the following disclosure substantially in this form: "In determining and monitoring staffing levels, Aegis considers resident assessments and other factors."

d.  Not later than the Effective Date, Aegis shall ensure that all Residence and Care Agreements, web pages, marketing brochures or other materials, and any other written statements to be provided to or made available to the consuming public in California and Washington and that discuss resident assessments are in compliance with the terms of this Injunction. The requirements of this paragraph of the Injunction shall apply only to Residence and Care Agreements, marketing brochures, web pages and any other statements provided to, made available or entered into with new or prospective residents after the Effective Date, and shall not require or obligate Aegis to amend or modify Residence and Care Agreements or other documents or statements provided to, made available or entered into prior to the Effective Date.

Staffing Requirements Under the Stipulated Injunction

    a.   Not later than the Effective Date, Aegis shall ensure continued compliance with all applicable regulations, including those related to providing staffing levels sufficient to provide current residents with the care services set forth in their service plans, including but not limited to: 22 CCR § 87411(a), § 87705(c)(4), WAC 388-78A-2450, WAC 388-78A-2160.

    b.   Without limitation to (and consistent with) the above-stated requirements, Aegis shall set staffing at its facilities based on Aegis's determination of the staffing hours reasonably required to perform the assessed care tasks needed by the residents as determined by Aegis's assessment procedures, the amount of time it takes to accomplish the given tasks, the experience and/or education of the staff, and the ability of staff to perform various tasks in parallel.

37.    The Injunction references a Compliance Report Addendum, which Defendant contends includes proprietary information concerning Aegis' operations.  As such, the Compliance Report Addendum will be made available to any Settlement Class Member (or legal representative or successor-in-interest) who requests it but not otherwise publicly disclosed.  All non-confidential settlement documents will be immediately available at the website for this class action settlement. The website will include a webpage stating that the confidential Injunction Compliance Report Addendum will be made available to any Settlement Class Member (or legal representative or successor-in-interest) upon request.

Release Provisions

38.    Under the Settlement Stipulation, the Named Plaintiffs and Settlement Class Members (excluding opt-outs) will release any and all actions, claims, demands, rights, suits, and causes of action of whatever kind or nature whatsoever that the Releasing Parties ever had, now have or hereafter can, shall, or may have against the Released Parties, including without limitation any and all damages, loss, costs, expenses, penalties, attorneys' fees and expert fees, and interest, whether known or unknown, suspected or unsuspected, asserted or unasserted, fixed or contingent, direct or indirect, whether sounding in tort or contract or any other legal theory, whether statutory, administrative, common law or otherwise, however pled, wherever brought and whether brought in law, equity or otherwise, arising out of or relating in any way or manner to the claims and allegations asserted or that could have been asserted in either or both Actions based on the facts

alleged in the complaints in the California and/or Washington Actions; provided that the following claims only are specifically excluded from this Release: (i) any individual claims for personal injuries, wrongful death, bodily harm, or emotional distress resulting from said claims for personal injuries, wrongful death or bodily harm; and (ii) claims based on a breach of the Settlement Stipulation or the Injunction.  Nothing in the Settlement Stipulation shall preclude any person or entity from asserting any and all relevant allegations in support of a claim for personal injuries, wrongful death, bodily harm, or emotional distress resulting from said personal injuries, wrongful death or bodily harm, including without limitation, allegations that the facility was understaffed. The releases are effective only after the settlement has been granted final approval and the Effective Date is reached.

<u>Class Notice and Settlement Administration Costs</u>

39.     The Settlement Stipulation provides dissemination of class notice to Settlement Class Members by first class U.S. Mail and e-mail. To effectuate notice, Defendant will provide names and contact information for all Settlement Class Members (and representatives/family members to the extent available) to the Administrator, which will be updated through standard change of address and other procedures. Any returned mail shall be re-sent after a skip trace is performed. In addition to mailing and e-mailing, a summary form of the Court-approved class notice will be published in the California and Washington editions of *USA Today* and posted on the settlement website. The costs of class notice and settlement administration expenses, which the Settlement Administrator estimates will not to exceed $105,000, will be paid from the Settlement Fund.

<u>Payment of Service Awards, Attorneys' Fees and Litigation Costs</u>

40.     Subject to Court approval, the Settlement Stipulation provides for Service Awards of $15,000 to each of the five Named Plaintiffs, collectively not to exceed $75,000. As will be established in detail in the formal application for Service Awards, Named Plaintiffs devoted substantial time to the case prosecution, including with discovery, depositions, and/or settlement negotiations.

41.     In addition, the Settlement Stipulation allows Plaintiffs' Counsel to file an application for attorneys' fees not to exceed $6.35 million and litigation costs not to exceed $1.3 million.  Prior to the Preliminary Approval Hearing, Plaintiffs will submit supplemental information pertaining to their attorneys' fees lodestar and litigation costs incurred to date.  Counsel anticipate that additional fees and costs will be incurred in connection with the approval proceedings, settlement administration, and related matters.  There is no clear sailing provision on fees or costs in the Settlement Stipulation.  Rather, it simply caps the maximum request that Plaintiffs can submit.  Plaintiffs will support the requested attorneys' fees and costs in a motion filed before the objection/opt-out deadline. Under the Settlement Stipulation, any monies not requested (or not approved) for fees and costs will be added to the Net Settlement Fund for payment to Settlement Class Members.

**Fairness Assessment**

42.     For several reasons, the collective Plaintiffs' Counsel believe the settlement is fair, appropriate, reasonable and in the best interests of the Settlement Class.  For purposes of this motion, it clearly falls within the "range of reasonableness" required for preliminary settlement approval.

43.     First, the Settlement Stipulation was reached through countless arms-length negotiations, which included four formal full-day mediations supervised by experienced neutrals, multiple conference calls and email exchanges that occurred over several years.  Those negotiations included mediations with Honorable Ronald Sabraw (ret.) on May 29, 2018 and October 2, 2018, with Honorable Bruce Hilyer (ret.) on October 22, 2019, and with Honorable Rebecca Westerfield (ret.) March 24, 2020.  The negotiations were hard-fought, with several instances where it appeared that the parties would not reach agreement.

44.     Second, Plaintiffs' Counsel here have extensive experience litigating and settling consumer class actions and other complex matters.  They have investigated the factual and legal issues raised in this action, and that investigation informed the settlement negotiations.  As discussed above, the parties engaged in substantial discovery that collectively between the

California and Washington Actions included a review of Defendant's production of over 214,546 pages of documents, including approximately 4,288 Excel and native files, and the depositions of fourteen witnesses, including Defendant's executive-level and facility-level personnel, and designated Persons Most Knowledgeable, the Plaintiffs' experts, Named Plaintiff and two witnesses with knowledge about the claims of the California Named Plaintiffs; as well as data intensive discovery resulting in the production of electronic employee payroll data as well as meet and confer efforts among Defendant and its resident assessment software vendor to obtain Defendant's electronic resident assessment data before reaching settlement.  Likewise, as discussed above, the pleadings were highly contested in both the Californian and Washington Actions.  These and other proceedings in the case produced a thorough vetting (pre-settlement) of the factual and legal bases for Plaintiffs' claims and the key defenses to those claims.

45.     The settlement will result in substantial benefits to the Settlement Class.  Under the Agreement, Defendant has agreed to pay $16.25 million, of which approximately $8.395 million will be available for distribution to Settlement Class Members.  Assuming that every Settlement Class Member is located for distribution of the payments, the average Settlement Award will be roughly $950 for the California Subclass, and $1,550 for the Washington Subclass.  If current addresses cannot be located for all potential class members (or their successors), such that additional funds are available for distribution, the Settlement Administrator will increase the per-class member payment.

46.     The projected average settlement award compares favorably with the likely recovery if the case was tried.  The lead claim for monetary relief in the lawsuit has been the recovery of the approximately $54 million in Community Fees paid by residents in California and Washington. Under Plaintiffs' case theory, the Community Fees would not have been paid had residents known the "true" facts that resident assessments are not used to set facility staffing. Unlike other charges—such as care fees as to which residents arguably received some value for services rendered—the Community Fees arguably are the least likely to be affected by Defendant's offset and related defenses. Defendant's records indicate the total amount of Community Fees paid by

Settlement Class Members was approximately $54 million.  As discussed above, Defendant has agreed to pay a settlement fund of $16.25 million, of which roughly $8.395 will be available for distribution to class members. Based on the proposed apportionment between the California and Washington Subclasses based on the respective percentage of the amount of total Community Fees paid, that translates to an estimated average Settlement Payment Percentage of approximately 13.9% of the average Community Fees paid by the California Subclass, and approximately 15.3% of the average Community Fees paid by the Washington Subclass. While the Community Fees represent the most solid damage claim at trial, for settlement purposes, there is no guarantee that the trier of fact would award the full amount of these fees. As to these fees, and other payments made by residents (such as rent), Defendant contends Plaintiffs' damage claims are barred (or at least mitigated by the resident's receipt of care services after move-in. In addition to substantive defenses, Defendant argues the claims are not suitable for class treatment, given the arguable resident-specific issues raised.  Even if the Court certified a litigation class, Defendant is expected to raise vigorous trial defenses as to both liability and damages. For example, Defendant argues there is no omission or misrepresentation concerning staffing levels or the use of assessments in setting or reviewing staffing levels at their assisted living facilities. Defendant contends resident assessments are considered in setting or reviewing staffing at its facilities, that their residency agreement does not promise that facility staffing levels will be based on any particular factor including resident assessments, and that prospective residents based their decision to enter their facilities on non-staffing factors.  While Plaintiffs disagree with Defendant's arguments, for settlement evaluation purposes, these and other defense arguments, asserted by skilled and experienced counsel, raise real trial risks and must be considered.

47.     Here, the projected average settlement payment of approximately $950 for the California Subclass and $1,550 for the Washington Subclass (which respectively represent roughly 13.9% and 15.3% of the hard damages most likely to recovered at trial per class member) is well within the range of reasonableness for Court approval.  As illustrated in the chart below, it also falls within the range of Class Counsel's previously approved class settlements involving similar

clients, claims, and/or issues.

| Case | Sett. Fund | Class Size | Notice Methods | No. and % of Claims | Avg. Recovery | Cy Pres | Admin. Costs | Fees and Costs | Injunct. Relief |
|------|-----------|-----------|----------------|---------------------|---------------|---------|--------------|----------------|-----------------|
| *Winans v. Emeritus Corp.* <br><br> N.D. Cal., No. 3:13-cv-03962-HSG | $13M | 19,000 | Mail, Newspaper, Website | (Opt Out Settlement) | $450 | *Pending supp. dist. to Sett. Class* | $155,000 | $3.667M / $121,243 | Phase out challenged assessment program. Cease alleged misrepresentations. |
| *Carnes v. Atria Senior Living* <br><br> N.D. Cal., No. 3:14-cv-02727-VC | $6.4 M | 13,750 | Mail, Newspaper, Website | (Opt Out Settlement) | $290 | $300,000 | $120,000 | $2.112M / $135,000 | Cease alleged misrepresentation. Agree to consider resident assessments in staffing. |
| *Lollock v. Oakmont Senior Living, et al.* <br><br> Alameda Cty. Sup.Ct., No. RG17875110 | $9M | 6,972 | Mail, E-Mail, Newspaper, Website | (Opt Out Settlement) | Projected $1,459.31, subject to distribution to Sett. Class | *Pending dist. to Sett. Class* | $75,000 | $3.490M / $328,745 | Staffing levels to ensure care personnel necessary to meet residents' needs. Cease alleged misrepresentations. |

48.    Further, the actual settlement awards will likely exceed the projected averages.  To be sure, the Settlement Administrator is tasked with making all reasonable efforts to locate and pay all Settlement Class Members (or their legal successors).  Still, the practical reality is that some Class Members will not be located or not have successors.  As such, some funds will go undistributed.  If so, under the Agreement, the Administrator will use those funds to increase the payment amounts for the Class Members who have been located.

49.    The potential risks attending further litigation support preliminary approval. Plaintiffs face significant challenges with respect to class certification. Among other arguments, Defendant contends that Plaintiffs' claims necessarily require consideration of the care services provided (or not) to each resident.  According to Defendant, that will trigger individual issues and thus negate class certification, under cases such as *Walmart* and *Comcast*.  Defendant also contends that written arbitration agreements between Defendant and up to approximately 90% of the class member residents preclude a litigation class in this case.  While Plaintiffs believe the claims asserted are proper for class treatment, Defendant's anticipated challenge to class certification is a litigation risk that bears on the overall settlement evaluation.  Even if the Court certified a litigation class, Defendant is expected to raise vigorous trial defenses as to both liability

and damages. For example, Defendant has asserted that residents received value (in the form of care services and other benefits) that negate (or at least mitigate) any recovery.  Defendant also argues that there is no misrepresentation or omission concerning staffing or staffing levels at Aegis' communities, or the use of assessments in setting or reviewing staffing or staffing levels. Defendant contends that resident assessments are considered in setting or reviewing staffing at its communities, and that prospective residents based their decision to enter Aegis' facilities on non-staffing factors. Again, Plaintiffs disagree with Defendant's arguments and other anticipated defense arguments.  But Defendant's contentions, asserted by extremely skilled and experienced counsel, raise real trial risks.

50.     Further, implementing the settlement now avoids delay, which is particularly important given the advanced age and frail condition of many Settlement Class Members. Proceeding to trial (and the inevitable appeal) could add several years or more to the resolution of this case.  Considered against the risks of continued litigation, and the advanced age of many of the Class Members, the totality of relief provided under the proposed Settlement Stipulation is more than adequate and well within the range of reasonableness.  Furthermore, the impact of the COVID-19 pandemic cannot be overstated.  Under the extraordinary and uncertain circumstances when the parties reached a putative settlement in July 2020, the West Coast had just come off of the initial surge in infections with no prospect of a vaccine.  Indeed, the first major COVID-19 hotspot was at a long term care center in a suburb of Seattle, Washington.  (*See* "Nearly Two-Thirds of Residents at Life Care Center in Kirkland, Wash., Had the Coronavirus, and for a Time, Suburban Seattle was the American Epicenter," *New York Times*, March 21, 2020, *available at* https://www.nytimes.com/2020/03/21/us/coronavirus-nursing-home-kirkland-life-care.html. )  The COVID-19 infection rate was soaring in long term care facilities, posing a significant threat to the health and safety of class member residents.  For example, studies have found that although less than one percent of the American population lives in long term care facilities, they have accounted for approximately 36% of US COVID-19 deaths.  (*See, e.g.*, "The Long-Term Care COVID Tracker," *The COVID Tracking Project*, *available at* https://covidtracking.com/nursing-homes-

long-term-care-facilities.)  The pandemic also posed a real and long term threat to the financial viability of businesses including Aegis.  In addition to contemplating Defendant's bleak financial picture, there were a slew of bills and executive appeals seeking broad legal immunity including for the long term care industry.  Moreover, as the Court is well aware, the myriad uncertainties arising from the pandemic also included months-long delays in civil cases, the cessation of jury trials, and the possibility of courts closing their doors completely in response to the pandemic.

51.     Although the Court is not asked at this stage to rule on the anticipated requests for attorneys' fees, reimbursement of litigation costs and service awards to the named plaintiffs. However, the record shows the amounts proposed in the Agreement on these items fall within an acceptable range.  Under the Agreement, the request for reimbursement of litigation expenses will not exceed $1.3 million, and Plaintiffs' attorneys' fees subject to Court approval will not exceed $6.35 million.  The anticipated fee request will represent a "negative" multiplier of approximately 0.59 on lodestar fees to date.  As of March 1, 2021, Plaintiffs' counsel worked approximately 16,350 hours on the California and Washington cases combined, with a lodestar of roughly $10.7 million and litigation costs incurred of roughly $1.3 million.  Given that additional attorney time will be required for settlement approval and implementation phases, the projected negative multiplier will be even lower.  The work to develop the case theory and litigate the California Action, including without limitation work performed by Plaintiffs' Counsel, the Named Plaintiffs, and Plaintiffs' experts, inured to the benefit of the Washington Action.  An award of the maximum attorneys' fees permitted under the Settlement Stipulation ($6.35 million) would represent approximately 39% of the Settlement Fund.

52.     In compliance with Rule 23(a)(1), the members of the Settlement Class are so numerous that joinder of all members is impractical.  The total Settlement Class consists of approximately 10,069 current and former residents of Aegis' facilities in California and Washington. 5,615 of the Settlement Class Members are in California, and 4,454 are in Washington.  Under the Settlement Stipulation, Defendant will provide the Settlement Administrator with a list of the last known contact information for all Settlement Class Members

1  prior to issuance of class notice.

2       53.     The Settlement Class defined by the Settlement Stipulation mirrors the Class

3  proposed in the Third Amended Complaint.  The Settlement Class consists of two readily

4  ascertainable subclasses:

> a.  All persons who resided at one of the Aegis Living branded California assisted living facilities at any time between April 12, 2012, through and including October 30, 2020 (the "California Class Period") that were owned or managed by Defendant or in which Defendant was identified as a licensee by California's Department of Social Services, including without limitation the following communities: Aegis Gardens (Fremont),  Aegis of Aptos, Aegis of Carmichael, Aegis of Corte Madera, Aegis of Dana Point, Aegis of Fremont, Aegis of Granada Hills, Aegis of Laguna Niguel, Aegis of Moraga, Aegis of Napa, Aegis of Pleasant Hill, Aegis of San Francisco, Aegis of San Rafael[1], Aegis of Shadowridge (Oceanside), and Aegis of Ventura ("California Subclass"); and

> b.  All persons who resided at one of the Aegis Living branded Washington assisted living facilities at any time between March 8, 2014, through and including October 30, 2020 (the "Washington Class Period") that were owned or managed by Defendant or in which Defendant was identified as a licensee by Washington's Department of Social and Health Services, including without limitation the following communities: Aegis Gardens (Newcastle), Aegis Lodge (Kirkland), Aegis of Bellevue, Callahan House (Shoreline), Aegis of Issaquah, Aegis of Kent, Aegis of Kirkland, Aegis of Lynnwood, Aegis of Madison (Seattle), Aegis of Marymoor (Redmond), Aegis of Mercer Island, Queen Anne on Galer, Queen Anne Rodgers Park, Aegis of Ravenna (Seattle), Aegis of Redmond, Aegis of Shoreline, Aegis of West Seattle, Aegis of Bothell, Aegis of Edmonds, and Aegis of Northgate[2] ("Washington Subclass").

       54.     The requirements of Rule 23(a)(2) are met, as the lawsuit involves several common class-wide issues.  Disputed issues common to the named plaintiffs and the Class include (a) whether Defendant violated the Consumer Legal Remedies Act, Washington Consumer Protection Act, and other statutes and regulations by misrepresenting and/or failing to disclose the manner in

---

[1] The parties acknowledge and agree that, with respect to Aegis of San Rafael, the Settlement Class includes only persons who resided at the Aegis of San Rafael facility between April 12, 2012 through and including March 31, 2016.

[2] The parties acknowledge and agree that, with respect to Aegis of Bothell, Aegis of Edmonds, and Aegis of Northgate, the Settlement Class includes only persons who resided at those facilities between March 8, 2014 through and including September 30, 2015.

1  which resident assessments would be used to determine facility staffing; (b) whether a "reasonable

2  consumer" would have been misled by Defendant's misrepresentations, misleading statements and

3  omissions; and (c) whether the Named Plaintiffs and class members were "damaged" and entitled

4  to monetary recovery.

5          55.     The claims of the Named Plaintiffs are typical of the claims of the Settlement

6  Class, as required under Rule 23(a)(3).  As alleged in the Third Amended Complaint, Defendant

7  misrepresented to Plaintiffs and the class members and/or their family members that Defendant

8  uses its resident assessment system to determine the care services to be provided by facility staff

9  and to assess and bill residents for corresponding care points.  Rather, Defendant allegedly has a

10  policy of fixed staffing, regardless of the results generated by its resident assessment system,

11  which results in residents not receiving all of the care they have paid for and/or being subjected to

12  the inherent risk that, on any given day, facility staffing will be insufficient to provide the

13  promised care for all residents.  Further, as alleged in the Third Amended Complaint, Defendant

14  has failed to disclose and concealed this material fact from the Named Plaintiffs and the class.

15  Plaintiffs' claims are typical of the claims of the proposed class in the following ways: 1)

16  Plaintiffs are members of the proposed class; 2) Plaintiffs' claims arise from the same uniform

17  corporate policies, procedures, practices and course of conduct on the part of Defendant; 3)

18  Plaintiffs' claims are based on the same legal and remedial theories as those of the proposed class

19  and involve similar factual circumstances; 4) the injuries suffered by the Named Plaintiffs are

20  similar to the injuries suffered by the proposed class members; and 5) Plaintiffs seek a common

21  form of relief for themselves and the members of the class.

22          56.     Plaintiffs have (1) demonstrated the "ability and the incentive" to represent the

23  class vigorously, (2) "obtained adequate counsel", and (3) "no conflict between the individual's

24  claims and those asserted on behalf of the class." Because the claims asserted by Named Plaintiffs

25  are typical of those asserted on behalf of the Class, the Named Plaintiffs have the same interests in

26  the outcome of this case.  As evidenced by the discovery and other efforts to date, Plaintiffs have

27  shown the incentive and ability to carry out their responsibilities as class representatives.  Further,

28

the case is being prosecuted by counsel well-versed in class actions generally and elder abuse matters in particular.

57.     Here, questions of law or fact common to the members of the class predominate over any questions affecting only individual members.  Under Rule 23(b)(3), a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  As explained above, the common issues triggered by the Named Plaintiffs' claims predominate over any individual questions, as resolution of issues such as whether a reasonable person would construe the Aegis contract as a promise to staff to meet assessed resident needs, and whether Aegis in fact disregarded its own resident assessments in setting facility staffing, will necessarily resolve the liability determination. Litigating these common issues on a class basis is clearly superior to multiple individual and duplicative proceedings on these same questions, particularly given the frail and elderly status of most Class Members.

58.     The form and manner of the Class Notice proposed here complies with Rule 23 and the overall requirements of due process.  The proposed Notice here provides sufficient detail in plain language to allow Settlement Class Members to make an intelligent decision with respect to their legal rights under the settlement. In clear and straightforward language, the Notice describes the claims asserted, the settlement terms, the monetary and other relief provided, and the amounts proposed for settlement administration, attorneys' fees and litigation costs, and service awards for the Named Plaintiffs.  It explains the procedures for opting out of, or objecting to, the settlement, along with the consequences of pursuing these options or remaining in the settlement.  Further, the manner of class notice proposed here satisfies the "best notice practicable" requirement under Rule 23(c)(2)(B).  The Settlement Stipulation provides dissemination of class notice to Settlement Class Members by first class U.S. Mail and e-mail. To effectuate notice, Defendant will provide names and contact information for all Settlement Class Members (and representatives/family members to the extent available) to the Administrator, which will be updated through standard change of address and other procedures. Any returned mail shall be re-sent after a skip trace is performed. In addition to mailing and e-mailing, a summary form of the Court-approved class

notice will be published in the California and Washington editions of *USA Today* and posted on the settlement website.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on this 22nd day of March 2021 at San Francisco, California.

_____
Kathryn Stebner